STATE *ex rel.* CITY OF CHARLESTON, *etc.*

*v.*

HUGH BOSELY, *City Mgr., etc.*

(No. 14031)

Decided July 15, 1980.

*Robert R. Harpold, Jr.*, City Atty., for plaintiff in error.

*Jackson, Kelly, Holt & O'Farrell, James K. Brown, Lee O. Hill, Michael A. Albert*, for defendant in error.

MCGRAW, JUSTICE:

This case is here on petition for writ of error filed by Mr. Hugh Bosely, City Manager of Charleston, West Virginia. Mr. Bosely represents that he is aggrieved by a final order of the Circuit Court of Kanawha County whereby a writ of mandamus was awarded upon petition of the City of Charleston, ordering Mr. Bosely to comply with certain directions of the City Council of Charleston. Mr. Bosely appeals to this Court to set aside the writ granted below, claiming that compliance with the order would run contrary to principles of the fundamental law of our state.

Briefly, the case has arisen as follows. The petitioner below, the City of Charleston, is a "Class I city" as defined by state law.[1] Under W. Va. *Code* §§ 8-16-1 and 8-16-2, the City is authorized to construct certain facilities referred to as "public works," and to issue revenue bonds for the payment of costs incurred in such projects. Additionally, W. Va. *Code* §§ 8-13-3 and 8-16-18a authorize any Class I city to levy and collect an excise tax upon the occupancy of hotel rooms within the corporate limits, and to pledge and expend the revenues therefrom for the payment of bonds which have been issued to construct convention facilities.

The City Council of Charleston, by ordinance, authorized the imposition of a hotel occupancy tax in June, 1975. Slightly more than one year later, in August, 1976, the City Council determined that there was a need in the city for the development of "additional convention facilities," and that such facilities would serve a public

---

[1] W. Va. *Code* § 8-1-3 defines a Class I city as a municipal corporation with a population in excess of fifty thousand, such population to be determined by official census figures under W. Va. *Code* § 8-1-4.

purpose. An ordinance was passed directing the respondent, Mr. Bosely, to execute a contract with a firm known as Economics Research Associates. This contract was to provide for an independent analysis of revenues to be generated from the hotel occupancy tax and the amount of bonds which could be issued, payable from these revenues, to finance development of the proposed convention facilities.

Mr. Bosely, in his capacity as city manager, refused to execute the contract, stating that he considered execution of such a project to be improper under certain provisions of the West Virginia Constitution. It was Mr. Bosely's position that the city would be paying for unnecessary services if the bonds could not be sold due to constitutional limitation.

Following Mr. Bosely's refusal to act, the City Council directed the mayor to secure proper determination of the legal issues involved. A petition for a writ of mandamus was then filed in Kanawha County Circuit Court by the city. In opposition to the petition and rule, respondent Bosely filed an answer and demurrer admitting the relevant facts and stating the reasons for his refusal to execute the contract. Briefs were filed and oral arguments made before Judge Thomas E. McHugh in April, 1977.

On May 17, 1977, the circuit court issued a written opinion upholding the city's position. Nine days later an order was issued awarding the writ of mandamus and ordering the respondent-appellant to carry out the direction of city council and to execute the contract with Economic Research Associates.

It is from this order that Mr. Bosely has appealed to this Court, asking that the writ of mandamus be set aside and the legality of the proposed bond issue be finally adjudicated.

I

Initially, there are three issues which must be addressed.

Petitioner's first contention is that the statutory provisions in W. Va. *Code* § 8-13-3, authorizing the collection of the hotel occupancy tax, constitute an improper delegation of legislative power to municipalities. This contention is based in the language of W. Va. Const. art. 6, § 1, which provides in part that "The legislative power shall be vested in a Senate and House of Delegates."

The gist of petitioner's argument is that all power to legislate on matters of legitimate state concern is vested in the state legislature, and that it cannot be handed down to any lesser authority. The weakness of this generalization is illustrated by the facts of this case. The legislature has decided that development of convention facilities is a matter of statewide import, but at the same time is most efficiently effectuated by implementation at the local level. This is not infirm. Having exercised the legislative power over the substantive issue, the legislature is free to delegate the administrative authority over local development to the affected communities' governing bodies. It has long been settled that the legislature is free to delegate authority to municipal corporations on matters of purely local concern. *See, State ex rel. City of Charleston v. Coghill,* 156 W. Va. 877, 207 S.E. 2d 113 (1973), and sources cited therein.

Petitioner next urges that the hotel occupancy tax act, W. Va. *Code* § 8-13-3 is void because it embraces more than one object, and because one of its objects is not expressed in the title, all in contravention of W. Va. Const. art. 6, § 30, which states in part that:

> No act hereafter passed, shall embrace more than one object, and that shall be expressed in the title. But if any object shall be embraced in an act which is not so expressed, the act shall be void only as to so much thereof, as shall not be so expressed, and no law shall be revived, or amended, by reference to its title only; but the law revived, or the section amended, shall be inserted at large, in the new act.

The terms of this constitutional provision have been considered many times, and its purpose has been well

defined. It is designed to insure that the title of an act contains a statement of the objects and purposes of the proposed enactment, thus preventing the incorporation of any legislation to which there was no index in the title. *State v. Voiers*, 134 W.Va. 690, 61 S.E.2d 521 (1950). The provision is intended to guard against the enactment of laws by fraud or deceit. It is designed to avoid laws that might be passed by including them in an act relating to a separate purpose, stated in the title, but which would in fact relate to other and different purposes, not so stated. *State ex rel. David v. Oakley*, 156 W.Va. 164, 191 S.E.2d 610 (1973); *State ex rel. Dyer v. Sims*, 134 W.Va. 278, 58 S.E.2d 766 (1950); *Cutlip v. Sheriff of Calhoun County*, 3 W.Va. 588 (1869).

The title of the act which created the hotel occupancy tax, Ch. 165, 1975 W.Va. Acts, is as follows:

> AN ACT to amend article thirteen, chapter eight of the code of West Virginia, one thousand nine hundred thirty-one, as amended, by adding thereto a new section, designated section three, authorizing class I cities to levy and collect a hotel occupancy tax; limiting the rate of any such tax to three percent of the room rental; providing that any such tax shall be imposed on the occupant and collected by the hotel as part of the consideration paid for the room; defining the term "hotel" for the purpose of the levy and collection of such tax; specifying the use to be made of revenues derived from such tax; and specifying provisions which must be set forth in any municipal ordinance imposing such tax.

This title, while comprehensive, is quite specific and fully discloses the purpose and various provisions of the act in question. Further, while several details are covered, they all deal with the same object, that is, the hotel occupancy tax. The title, and the act itself, were designed to cover all technical statutory aspects of the new tax. This does not mean that the act deals with more than one object; it just means that the act covers one object comprehensively.

In 1970, this Court announced a standard which is in accord with a common sense view of the purpose of W.Va. Const. art. 6, § 30. In *City of Huntington v. Chesapeake and Potomac Telephone Co.*, 154 W.Va. 634, 177 S.E.2d 591 (1970), it was said that:

> The title of a statute will generally be regarded as sufficient, not only where the subject or object of the act is clearly disclosed by the title, but also where it fairly or reasonably expresses, embraces, or indicates the general subject or object, is directly or indirectly related, germane, cognate, incidental, auxiliary, or subservient thereto, and has a proper, fair, reasonable, consistent, material, or necessary connection therewith, so that the subject matter of the statute is not foreign to that expressed in the title, and may be easily determined, or readily inferred, therefrom. Indeed, for a law to be valid, its subject or object must not be so foreign to the title, but must be so expressed in its title as to give a reasonable or fair notice, suggestion, or indication thereof. *Id.*, at 642; 177 S.E.2d at 597, citing 50 Am. Jur., *Statutes*, Section 173, pages 153-154.

All provisions found in W. Va. *Code* § 8-13-3 are properly expressed in the title previously cited. The act deals, in general terms, with the hotel occupancy tax. It specifically provides for (1) its imposition, (2) its maximum rate, (3) the mechanism by which it is to be collected, (4) the extent of enterprises covered, (5) the purposes for which the tax may be expended, and (6) the technical requirements of a municipal ordinance imposing the tax. Each of these topics is directly related to the general subject of the act. There is a natural and necessary connection among all the provisions, so that none are "foreign" to the purpose expressed in the title. "When the principal object of an act of the Legislature is expressed in the title, and the act embraces, along with such principal object other incidental or auxiliary objects germane to the principal object, the act is not repugnant to section 30, art. 6, of the Constitution, and is valid as to such principal and auxiliary or incidental

object." Syl. pt. 4, *City of Huntington v. Chesapeake and Potomac Telephone Co.*, 154 W.Va. 634, 177 S.E.2d 591 (1970); Syl. pt. 10, *State v. Mines*, 38 W.Va. 125, 18 S.E. 470 (1893); *Compare* Syl. pt. 3, *Shields and Preston v. Bennett*, 8 W.Va. 74 (1874).

As a final preliminary matter, it is asserted that the decision by the City of Charleston to develop convention facilities is invalid because it does not fulfill a public purpose, but instead is primarily designed to aid the area's business and commercial interests. This contention is based on the fundamental rule that any power conferred upon a municipality must be exercised for a public use or purpose as distinguished from a private purpose. *See generally*, 2 McQuillin, *Municipal Corporations* § 10.31 (3rd ed. 1979).

The fact that the business community may derive benefit from the proposed facilities does not negate the "public" character of these facilities. In fact, it is difficult to imagine any public facility which does not to some extent promote business and commerce. In this case, it is entirely possible and conceivable that the city council made a carefully reasoned decision that adequate convention facilities were necessary to the general welfare of the residents of Charleston. Such facilities do, after all, encourage business and commercial development (thereby increasing the city tax revenues), and additionally serve as a center for cultural, charitable, business and government activities for the citizens' benefit.

In recognition of the proper roles to be served by each of our branches of government, it has been held that "a legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest." Syl pt. 2 *State ex rel. Kanawha County Building Commission v. Paterno*, 160 W.Va. 195, 233 S.E.2d 332 (1977); Syl. pt. 2 *State ex rel. West Virginia Housing Development Fund v. Waterhouse*, 158 W.Va. 196, 212 S.E.2d 724 (1974); *see also State ex rel. Appala-*

*chian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965). We are unable to say that the project proposed by the City of Charleston is unrelated to the public good. It has previously been recognized by this Court that the concept of "public purpose" must be expansively defined, specifically allowing for economic and commercial development. *State ex rel. City of Charleston v. Coghill, supra.* *See also*, 10 McQuillin, *Municipal Corporations* § 28.14 (3rd ed. 1966). In light of the clear public use to which the proposed facilities would be devoted, the city was well within the bounds of valid legislative choice.

## II

A more difficult question arises when we consider whether the grant of taxation authority exclusively to Class I cities constitutes invalid "special legislation."

W. Va. Const. art. 6, § 39 instructs that "local or special laws" are not to be passed in eighteen specifically enumerated areas. This provision goes on to say that:

> The legislature shall provide, by general laws, for the foregoing and all other cases for which provision can be so made; and *in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case*, nor in any other case in which the courts have jurisdiction, and are competent to give the relief asked for (emphasis added).

The purpose of this provision is evident, and has been discussed on more than one occasion. The intent of the framers was to preserve uniformity and consistency in the statutory enactments of the state. *See, e.g., State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 153 S.E.2d 284 (1967); *Truax-Traer Coal Co. v. Compensation Commissioner*, 123 W.Va. 621, 17 S.E.2d 330 (1941); *Brozka v. County Court of Brooke County*, 111 W.Va. 191, 160 S.E. 914 (1931).

This "special legislation" prohibition, Art. 6, Sec. 39 is an equal protection clause. *Cimino v. Board of Education*, 158 W.Va. 267, 210 S.E.2d 485 (1974). It serves to prevent the arbitrary creation of special classes, and the

unequal conferring of statutory benefits. A legislative enactment in order to be valid under this clause, must operate alike on all persons and property similarly situated. As long as a statute applies uniformly upon a class, and as long as the classification utilized is neither arbitrary, nor unreasonable, the statute is general. *State ex rel. Appalachian Power Co. v. Gainer*, 147 W.Va. 740, 143 S.E.2d 351 (1965); *State ex rel. Heck's v. Gates*, 149 W.Va. 421, 141 S.E.2d 369 (1965); *State ex rel. Dieringer v. Bachman*, 131 W.Va. 562, 48 S.E.2d 420 (1948).

Initially, we note that legislative classifications based on population are not per se invalid. This Court has specifically approved population-based classifications when they relate in some way to the statutory purpose involved. *State ex rel. County Court of Cabell County v. Battle*, 147 W.Va. 841, 131 S.E.2d 730 (1965); *cf., Shackleford v. Catlett,* ___ W.Va. ___, 244 S.E.2d 327 (1978). An instructive case is this Court's unanimous opinion in *State ex rel. Taxpayers Protective Association of Raleigh County v. Hanks*, 157 W.Va. 350, 201 S.E.2d 304 (1973). As the Court noted in Syl. pt. 3, "[a] statute which establishes a classification by population is not violative of the constitutional provision requiring such matters to be provided for by general law, where the statute operates uniformly on all persons and things of a class *and the classification according to population is natural, reasonable and appropriate to the purpose of the statute*" (emphasis added).

What we must determine, then, is whether the legislative classification restricting the authority to tax hotel occupancy to Class I cities is natural and reasonable and is appropriate to the purpose of the statute, which is to promote tourism and to provide for economic development and the indicia of civilization at the local level through the construction of "arenas, auditoriums, civic centers and convention centers." We conclude that it is not.

In this case, we deal with a grant of tax authority. The effect of this legislation is to confer upon a city the

power to collect additional tax revenues—revenues which may be used to develop "arenas, auditoriums, civic centers and convention centers." W. Va. *Code* § 8-13-3. This is a valid and laudable purpose. Yet, the legislature has chosen to confer these benefits only upon those cities with a population in excess of fifty thousand. The opportunity for development of local meeting facilities is denied to all of the state's smaller municipalities.

We see no rational reason to restrict the benefits of the tax to the State's only Class I cities, Charleston and Huntington. Why not allow for development in incorporated cities surrounding the favored cities when they are obviously all part of the same urban pattern and market area. What is the difference between the needs of the people of Charleston, South Charleston, Dunbar, Nitro and St. Albans; or the people of Wheeling, Benwood, Bethleham, Clearview, Tridelphia and Valley Grove? In each of these, as well as other instances, urban patterns and market areas include populations exceeding 50,000 and in some instances the local community has called upon other resource bases than a hotel tax in order to construct facilities authorized by the statute.

Why not allow for the possibility of such a tax on West Virginia's oldest convention center and most famous hotel, the Greenbrier, outside of but adjacent to White Sulphur Springs? Why not allow for such a tax in counties with existing convention centers near the unincorporated communities of Cairo, Canaan, Ice's Ferry, Omps. True, Saulsville and Slatyfork? Can it be said that the people in these communities and their counties would refuse arenas, auditoriums, civic centers and convention centers if someone else is to pay for them? We think not.

What possible rational reason could the legislature have had for sanctioning such a classification? It cannot be that municipal growth and development are of particular interest only to cities with populations of 50,000 or more. It is in the interest of every community, perhaps more so in the case of our smaller municipalities, to

stimulate economic growth. It cannot be that our urban centers have an exclusive interest in bringing in conventions, attractions and public events which promote tourism. West Virginia's tourist attractions are not just its urban centers. Persons visiting our State aren't interested exclusively in touring metropolitan restaurants or theaters; they also come to see "Wild and Wonderful West Virginia." Those who maintain that it is rational to tout our cities as our primary tourist attractions without taking into account the bucolic splendor and scenic majesty of the State, simply do not understand the true charm and attraction of our mostly rural State. The promotion of tourism and the development of civic facilities to stimulate community growth are statewide concerns. The legislature acts arbitrarily and unreasonably in providing a mechanism to local governments to further these goals if it excludes a single municipality on the basis of population.[2] If one municipality is to be given the authority to tax in order to further civic development, all municipalities should be given that authority. This is the fundamental meaning of W. Va. Const. art. 6, § 39.

The appellee argues that there is no actual discrimination; that the tax will also extend to other municipalities which *become* Class I cities. This argument is abstractly attractive but unrealistic as a practical matter. At this point in the state's development it is difficult to predict patterns of population growth. Research trends indicate that few other cities are on the verge of achieving Class I status. For all practical purposes, the authority to

---

[2] Our puzzlement over this seeming discrimination is increased by a close examination of W. Va. *Code*, chapter 8, § 13, relating to Municipal Taxation and Finance. In looking at W. Va. *Code* § 8-13-1 through 8-13-11, we note that the legislature has seen fit to confer upon the State's municipalities extensive tax authority relating to a myriad of subjects. The hotel occupancy tax is the only instance in which authority is restricted to one class of municipalities. Each of the other sections specifically confers authority upon every municipality in the State. The conclusion that the discriminatory scheme embodied in this tax statute resulted from lobbying by special interest is nearly inescapable.

impose this tax is restricted to only two cities for the foreseeable future.[3]

Proponents of discredited theories of "trickle-down" economics will probably see today's holding as a threat to their model of how the world ought to be organized. That is unfortunate. We have no quarrel with legitimate generalized legislative classification. Nor, more specifically, do we question the validity of population based classifications. There is no doubt that classifications based on population figures are administratively convenient, and in many instances might conceivably serve to effectuate a valid policy. *See, e.g., State ex rel. County Court of Cabell County v. Battle, supra.* The Court's ruling today does not question the concept of population-based classification; it instead is concerned with the relationship between the classification and the legislative purpose of promoting statewide tourism and municipal development.

We simply cannot turn from this veiled attempt at special interest legislation. Courts should never condone irrational legislative classifications which set big city

---

[3] Indeed, the most recent data available indicate that we face a situation in which the State's most populous cities are losing, rather than gaining population. In April of 1970, Wheeling was within 2,000 people of achieving Class I status, but by July, 1975, had dropped to 44,369. Likewise, 1970 figures indicate that Parkersburg had a population of over 44,000, but by 1975 had fallen off to less than 39,000. Only one other city had a population above 30,000 in 1975: Morgantown, with a figure of 30,318. U.S. Bureau of the Census. *County and City Data Book, 1977*, at p. 768. Figures from the 1980 Census are not yet available.

These statistics only serve to illustrate the problem. The present Class I cities are given tools for growth, while those in the second echelon, striving for civic development, lose population as they are denied the means with which to spur economic development. The figures also raise another problem. What if Wheeling had been slightly above 50,000 in 1970, and then had fallen below that figure in 1975? Apparently, they would no longer have authority to collect the tax. If the city had issued bonds, how could they be paid off? The message should be obvious. It is not a corporate limits population of 50,000 that makes a place a convention center, and it is arbitrary to the point of absurdity to suggest otherwise.

people above small town people or for that matter, urban people above country people. For the obverse, *see* *Stephens v. Raleigh County Board of Education,* ___ W.Va. ___, 257 S.E.2d 174.[4] The restriction of tax authority to specific political subdivisions based on population levels, to the detriment of the remainder of the State's population, is an arbitrary, unreasonable and inappropriate means by which to implement a general statewide program of civic and economic development, and is therefore void under W. Va. Const. art. 6, § 39, prohibiting "special legislation."

As a final note, we must remember that the mere fact that a statute is "special" as opposed to "general" does not automatically lead to a judgment of constitutional infirmity. W. Va. Const. art. 6, § 39 does allow for the enactment of special laws in some circumstances, but only where a general law is not "proper" and cannot "be made applicable to the case." This case does not present such a situation. We can think of no reason why a statute conferring the tax authority involved here could not be applied to all the State's municipalities. Certainly, some cities will not want to impose such a tax, but this is still no reason to deny them the authority to do so. The statute as written does not mandate a hotel occupancy tax in each eligible city; it only confers the authority to impose one. Under a general law, no municipality would be required to impose an occupancy tax, but each would have the authority, and therefore the ability, to choose whether such a tax would be beneficial to their particular situation.

Since this tax statute is void, the City of Charleston may not continue to collect a tax thereunder. Mr. Bosely

---

[4] "... The classification upon which the Legislature has premised the privilege involved here is a natural one ... Despite recent trends of urbanization and industrialization, the tilling of the earth remains the highest and best use to which land can be put. It is impossible to conceive of a more fundamentally important endeavor than the cultivation and harvest of food for the maintenance of the race ... The preservation of land fit for agriculture-related uses is a legitimate goal ..."

was correct in his contention that the statute is an unconstitutional "special act". Therefore, he will be granted the relief sought. The writ of mandamus awarded below is set aside and shall be of no force or effect hereafter.

Petitioner also raises the issue of the constitutionality of the bond financing structure under the provisions of our State Constitution prohibiting the incurrence of government debt. In light of the disposition at which the Court has arrived, it is unnecessary to reach the issue and we decline to address it.

For the reasons cited, the relief sought by the appellant is granted. The judgment of the Circuit Court of Kanawha County is hereby reversed.

*Reversed.*

NEELY, CHIEF JUSTICE, *dissenting:*

I concur in Part I of the majority opinion but I am compelled to dissent from Part II because it is economically and legally unsound. The issue is not whether a grant of municipal taxing authority may be restricted to Class I cities, but rather, whether a specific *type* of taxing authority for a specific *purpose* may be legitimately restricted to Class I cities.

On both the basis of policy and prior decisional law, such a grant of taxing authority is constitutionally valid. Obviously, once this Court determines that the Legislature has acted within constitutional bounds, it is not for the Court to gainsay their policy. *State ex rel. Appalachian Power Company v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965).

The majority would strike down *W. Va. Code* 8-13-3 [1975] as "special legislation" under *W. Va. Const.*, art. 6, § 39.[1] This is a surprising departure from prior case law

---

[1] The text of Article 6, § 39 reads, in full:

The legislature shall not pass local or special laws in any of the following enumerated cases; that is to say, for Granting

which threatens disastrous consequences to the management of State affairs. The provision of the *Constitution* prohibiting special legislation has a long history in this State. The purpose was, originally, to discourage "private solicitation of the members [of the Legislature], the tendency of which is to introduce corruption and bribery as elements of legislation." Volume III, *Debates and Proceedings of the First Constitutional Convention of West Virginia*, at 831 (comments of President A. D. Soper). A second purpose was to preserve uniformity and consistency in legislation. *See Brozka v. County Court of Brooke County*, 111 W.Va. 191, 160 S.E. 914 (1931); *State ex rel. Rickey v. Sims*, 122 W.Va. 29, 7 S.E.2d 54 (1940). The case law in this area is well developed and provides

---

divorces;

Laying out, opening, altering and working roads or highways;

Vacating roads, town plats, streets, alleys and public grounds;

Locating, or changing county seats;

Regulating or changing county or district affairs;

Providing for the sale of church property, or property held for charitable uses;

Regulating the practice in courts of justice;

Incorporating cities, towns or villages, or amending the charter of any city, town or village, containing a population of less than two thousand;

Summoning or impaneling grand or petit juries;

The opening or conducting of any election, or designating the place of voting;

The sale and mortgage of real estate belonging to minors, or other under disability;

Chartering, licensing, or etablishing ferries or toll bridges;

Remitting fines, penalties or forfeitures;

Changing the law of descent;

Regulating the rate of interest;

Authorizing deeds to be made for land sold for taxes;

Releasing taxes;

Releasing title to forfeited lands.

The legislature shall provide, by general laws, for the foregoing and all other cases for which provision can be so made; and in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case, nor in any other case in which the courts have jurisdiction, and are competent to give the relief asked for.

the standard by which the constitutionality of *W.Va. Code*, 8-13-3 [1975] must be judged.

Several general principles can be drawn from a study of the cases. In any case where a legislative enactment is challenged as a special act the first issue to be addressed is the classification involved, i.e., what is the nature of the classes created by the Legislature? *Shackleford v. Catlett*, ___ W.Va. ___, 244 S.E.2d 327 (1978). The second issue is whether the classification created is reasonably related to a valid State purpose. *State ex rel. Dieringer v. Bachman*, 131 W.Va. 562, 24 S.E.2d 420 (1948). If the classification is reasonable and not arbitrary the next matter of inquiry is whether all members of a class similarly situated are treated in a like manner. *Bachman, supra.* If the classification is rational and all members of the class similarly situated are treated in a like manner, then the enactment is a general one and does not violate the constitutional prohibition. *State ex rel. County Court of Cabell County v. Battle*, 147 W.Va. 841, 131 S.E.2d 730 (1963). Any doubt in this regard is to be resolved in favor of the Legislature:

> It seems quite clear ... that the constitution of this state gives rise to a rule of construction when the question involved is whether an enactment is classified as a general act or as a special or local act. There is a well settled general rule that in cases of doubt, the legislative intent not to exceed their constitutional powers is to be presumed, so that the outgrowth of a doubtful construction is to so construe as to render it constitutional. [Citation omitted.] Based upon that presumption of the legislative intent and purpose, it follows that the legislative intent to comply with the constitutional directions in enacting legislation and to enact a general law, instead of a special or local law, wherever a general law "can be made applicable to the case" should be weighed when the conclusion is doubtful. Supposedly the Legislature is familiar with the terms and provisions of our constitution, and desires to conform to and be governed by them. We believe

that this section of our constitution requires the courts, in cases of doubt, to favor the construction which would result in a statute being viewed as a general law. [*State ex rel. Rickey v. Sims*, 122 W.Va. 29, 7 S.E.2d 54 at 57 (1940).]

Even if it is decided that the challenged act is special legislation, i.e., the classification is unreasonable or treats members of a class differently, inquiry should not end there. It is proper to consider whether the special legislation fits into the exception contained in Article VI, Section 39 that permits such special legislation where a general act cannot be made applicable. *See, e.g., Meisel v. Tri-State Airport Authority*, 135 W.Va. 528, 64 S.E.2d 32 (1951); *Hedrick v. County Court of Raleigh County*, 153 W.Va. 660, 172 S.E.2d 312 (1970). The existence of general legislation forecloses this inquiry at the outset because a general law has been made applicable. *See, e.g., Brozka, supra; Truax-Traer Coal Co. v. Compensation Commissioner*, 123 W.Va. 621, 17 S.E.2d 330 (1941). If there is not an existing general law then the Legislature's determination whether a general law can be made applicable is controlling and cannot be reversed unless it is clearly and palpably wrong. "If a reasonable necessity for a special or local law is apparent or is indicated in the Statute, it will be presumed that the legislature properly considered the matter and the courts will not disturb such legislation." *Battle, supra*, at 735. When these principles are applied to the case currently before us it is clear that under any rational, objective analysis the statute involved is constitutional.

*W. Va. Code*, 8-13-3 [1975] allows Class I cities to impose a hotel occupancy tax and to devote the proceeds to construction, financing, and promoting convention facilities.[2] It is not contended by the majority that the stat-

[2] *W.Va. Code*, § 8-13-3 reads in full:

Each Class I city shall have plenary power and authority to levy and collect an excise tax upon the occupancy of hotel rooms within the corporate limits of such city; but the rate of such tax shall not exceed three percent of the cost of the hotel room or rooms. The tax shall be levied on the person paying

ute embodies an improper purpose. The majority readily accepts the Legislature's judgment that the development of convention facilities is a matter to be disposed of at the local level. Indeed, the Legislature's control over, and right to delegate authority to, municipalities cannot be seriously contested in this jurisdiction. *See, e.g., State ex rel. City of Charleston v. Coghill*, 156 W.Va. 877, 207 S.E.2d 113 (1973); *State ex rel. Plymale v. City of Huntington*, 147 W.Va. 728, 131 S.E.2d 160 (1963). This is especially true in the area of the taxing power. *Tweel v.*

---

the consideration for the occupancy of the hotel room and shall be collected by the hotel as part of the consideration paid for the use of the hotel room. The tax shall not be levied on any person paying the consideration for the occupancy of a hotel room for ninety or more consecutive days.

For the purpose of this section and any ordinance enacted pursuant thereto, the term "hotel" means any building or buildings in which the public may, for a consideration, obtain sleeping accommodations, including, but not limited to, hotels, motels, inns or courts. The term "hotel" shall not be construed to mean any hospital, sanitarium, extended care facility, nursing home or university or college housing unit.

All revenues collected by a Class I city from any such hotel occupancy tax shall be deposited in the general revenue fund of such city and expended for the following purposes and none other: (1) Planning, construction, reconstruction, establishment, acquisition, improvement, renovation, extension, enlargement, equipment, maintenance, repair and operation of convention facilities including, but not limited to, arenas, auditoriums, civic centers and convention centers; (2) the payment of principal or interest or both on municipal bonds issued pursuant to the provisions of article sixteen [§ 8-16-1 et seq.] of this chapter, the proceeds from the sale of which were used to finance convention facilities; (3) the promotion of conventions; or any combination of the foregoing.

The ordinance of any Class I city imposing any such hotel occupancy tax shall (1) specify the minimum number of hotel rooms which a hotel must have in order for the occupancy of such hotel to be subject to the tax herein authorized, (2) specify the rate of tax, which shall not exceed three percent of the cost of the hotel room or rooms; (3) provide the manner in which the occupancy tax shall be collected and remitted to such Class I city; and (4) provide such other provisions as are necessary for the proper administration and enforcement of the tax. (1975, c. 165.)

350

*West Virginia Racing Commission*, 138 W.Va. 531, 76 S.E.2d 874 (1953). The majority readily accepts that development of convention facilities serves a public purpose. Yet the majority would strike down the statute. Apparently the basis for their holding is that, although the purpose to be served is valid, the classification involved is not reasonably related to that purpose. The majority ignores the rôle of the Legislature in this area and merely asserts, but does not prove, that the means chosen to implement the purpose is constitutionally impermissible. The majority holds the classification unreasonable. I disagree.

The classification involved here is the division of municipalities into classes on the basis of population. The Legislature's general power to undertake such classification is clear. Indeed much of Chapter 8 of the *Code* dealing with municipalities is based on such a system of classification. Additionally, such classifications can be found throughout our law from provisions relating to Civil Service to county participation in the Workmen's Compensation program. The majority wisely does not attack this scheme of classification *per se* but, instead, asserts that the classification does not bear a rational relation to the purpose of the statute.

The first aspect of analysis in a case such as this is similar to Equal Protection Clause analysis. *Shackleford, supra.* In *Shackleford* this Court considered a statute which allowed a county to elect whether to join the Workmen's Compensation program. We held that the relevant class created was the employees of the particular county involved, not, as the plaintiff urged, all county employees in the State. We sustained the statute against both Equal Protection and special legislation attacks. Writing for a unanimous court, Chief Justice Caplan said:

> We must determine whether the challenged state statute ... bears some rational relationship to legitimate state purposes; whether the classification is a rational one based on social, economic,

historic or geographical factors; whether the classification bears a reasonable relationship to a proper governmental purpose; and, whether all persons within the classes are treated equally. [*Shakleford, supra*, at 330.]

The class involved in the present case is not all cities or municipalities in the State; it is all Class I cities. The statute in effect creates two classes: cities with populations of 50,000 or more and cities with a population of less than 50,000. The Legislature can draw such distinctions and validly treat the members of the different classes differently. *Battle, supra*, at 735; *State ex rel. Heck's Inc. v. Gates*, 149 W.Va. 421, 141 S.E.2d 379 at 387 (1965).

The purpose of *W. Va. Code*, 8-13-3 [1975] is to promote the development of convention facilities within the State. The purpose of the statute is not to promote the economic growth of some areas at the expense of others, although economic growth in Class I cities may well be an effect of the development of convention facilities. The Legislature may well have been aware of such an effect, as well as other effects, such as a general boost in tourism, employment, and overall State economic activity.

If, as a matter of policy, the Legislature decides that convention facilities should be encouraged in Class I cities but not others, it is not our rôle to substitute our own judgment.[3] Rather, our rôle is to determine wheth-

---

[3] Courts are not concerned with questions relating to the policy of a legislative enactment. Questions relating to policy are solely for the legislature. The general powers of the legislature are almost plenary. It can legislate on every subject not interdicted by the Constitution itself. In considering constitutional restraint, the negation of legislative power must appear beyond reasonable doubt .... In recognition of fundamental and constitutional principles relative to separation of powers in government, courts have recognized that the necessity for and reasonableness of classifications for purposes of legislation ... are primarily questions for the legislature and, if any state of facts can be reasonably conceived to support the classification, such classification is binding upon the courts .... A legislative classification cannot be held by a court to be invalid unless it is

er any possible set of facts can be conceived to justify the Legislature's choice. I would note that we are bound by the *Constitution*, prior decisions and the fundamental principles of *stare decisis* when we set out to manage the State economy, since in the area of economics certainty in the law is the pre-eminent policy of justice. Thus, the real question in this case is whether a set of facts can be conceived to justify the Legislature's policy decision to limit the benefits of the operation of the statute to Class I cities.

The majority's argument is, essentially, that the Legislature cannot grant a monopoly on convention facility development to Charleston and Huntington.[4] The major-

devoid of reason, arbitrary or unreasonable. In that area, a court cannot substitute its judgment for that of the legislature. Courts cannot be concerned with legislative policy or the mere widsom or lack of wisdom of the statute in question. [*Gainer, supra,* at 357, 363-364.]

[4] The majority would have us believe that the section is effectively restricted to Charleston and Huntington "in the tweel light of reality" because "no other cities are on the threshold." This is not the case. Of the seven other cities mentioned by the majority, two, Parkersburg and Wheeling, were on the verge of Class I status at the time of the 1970 census. Parkersburg then had a population of 43,225. A 1977 estimate of the population of Parkersburg shows that it has declined 12.3% to 38,784; the population of Wood County has, however, increased 2.7% and projections show Parkersburg beginning to grow once again. It is projected that by 1990 the population of Parkersburg will be between 47,000 and 54,000 people. Wheeling had a population of 48,188 in 1970. Again the 1977 estimates show a decline of 10.4% in that city's population. Unlike Parkersburg, however, the projections for Wheeling do not show an expected reversal of that trend. But such an occurrence is not impossible should a planning effort such as that currently found in Parkersburg be instituted. Another city mentioned by the majority, Beckley, is one of the fastest growing cities in the southeast. It had a population of 19,884 in 1970. By the time of the 1977 estimate population had increased 7.3% to 21,343, while the population in Raleigh County had increased 17.6% in the same time. Given the continued growth of that area – the 1977 estimate put Raleigh County's population at 82,384 – and Beckley's well-known penchant for annexation, Beckley may well be our next Class I city.

An argument similar to the majority's was advanced by the plantiff in *Tweel, supra.* In rejecting the argument we noted that the

ity does not consider whether there might be a rational basis for such an action even if that is what the statute does. I do not think that the statute has that effect or purpose. Other cities in this State may well attain Class I status in the future. So let us turn to the question of whether there was a rational basis for granting Class I cities this additional benefit and incentive. Justice Caplan, in *Shackleford, supra,* provided some indication of where to look for a rational basis when he referred to "classification ... based on social, economic, historic or geographical factors." In this case it is obvious that the classification is rationally based on economic considerations.

Development is not something that can be willed into being or, as the sad experience of the Great Society aptly illustrates, be created by throwing money and people into a vacuum. There must first exist an infrastructure before development can be encouraged. In the present case, for example, it would be futile to extend the hotel occupancy tax to cities which had few hotels to tax. It is not unreasonable for the Legislature to have found that only Class I cities supported enough hotel facilities to make such a tax economically viable.[5] Additionally, the same assumption must necessarily apply to restaurants, theaters, airports, and other social amenities which are part of the infrastructure necessary for successful development and promotion of convention facilities.

It is also a well accepted principle of development economics that there are economies of scale inherent in

---

class was not closed, creating a monopoly in the existing members of the class. The same applies here. It is useless to speculate whether other cities will indeed reach Class I status in the future. Indeed, it is not our rôle to engage in such speculation. The mere possibility is sufficient.

[5] There are indications that the Legislature considered and rejected extending the benefits of *W.Va. Code,* 8-13-3 to Class II and III cities. *See,* J. of the House of Del., 62nd Leg., Reg. Sess., H.B. 1062 (1975) at 360, 822, 823, 830 and 1177. The legislative choice was a considered action and was not undertaken arbitrarily.

urban conditions which can be successfully exploited. This, coupled with the consideration that limited monopoly promotes economies of scale, makes the action of the Legislature eminently reasonable in this case. Essentially the Legislature decided to encourage our Class I cities to compete with cities such as Cincinnati, Louisville, Columbus and Pittsburgh for a limited convention trade. It is reasonable to concentrate our State's resources in urbanized areas where the Legislature believes that we can build up an infrastructure of sufficient strength to permit us to compete with other states, while at the same time recognizing that a hotel occupancy tax in cities which can never compete successfully will be nothing but a nuisance and a potential economic liability. If legislators from smaller counties conceive that the overall effect of a statewide hotel occupancy tax will be detrimental to their counties, while the legislators from counties with large cities believe that such a tax will further the development of their section, a proper legislative compromise can be effected by the exact division of municipalities into classes based on population which is under review. The Legislature sought to achieve and did achieve a Paraeto Optimum in which everyone was made better off without making anyone worse off. It is as unjust to treat unequals equally as it is to treat equals unequally!

The majority's reliance on *State ex rel. Taxpayers Protective Association of Raleigh County v. Hanks*, 157 W.Va. 350, 201 S.E.2d 304 (1973) is sadly misplaced. In *Hanks* we struck down a statute which exempted counties with a population of 100,000 or more from the operation of a law which required the Court Clerk's office to remain open on Saturdays. The exception would have worked only upon Kanawha and Cabell Counties. The decision in *Hanks* had two alternative foundations. The first, that the act involved violated the express provision of Article VI, Section 39 prohibiting "regulating or changing county or district affairs" is inapplicable here. It is not urged that *W.Va. Code*, 8-13-3 [1975] violates any of the enumerated prohibitions of Article VI, Section 39. The sec-

ond reason in *Hanks* was that the classification was not reasonably related to the purpose of the statute. On the facts of *Hanks* that was clearly a correct decision, but to go from that to say that any classification which singles out the two regions there involved is to apply an arbitrary test not supported by the cases, including *Hanks*, or by logic. The purpose of the statute in *Hanks* was to insure ease of access to public officials by requiring a public office to be open on Saturdays. The exception would have frustrated that purpose in our two most populous counties. But the case does not stand for the proposition that all legislative classifications involving Kanawha and Cabell counties are void. Rather, it is an example of proper rational basis analysis. When that analysis is applied to the statute involved in this case, it is clear that a rational basis exists for the Legislature's classification.

Even if we were to hold, and I do not see how we can rationally do so, that *W.Va. Code,* 8-13-3 [1975] is special legislation, it is still valid and constitutional. *W.Va. Const.,* art. VI, section 39 would permit special legislation where it serves a valid purpose and a general law cannot be made applicable. It is not contested that the statute in this case serves a valid purpose. Given that, and the erroneous assumption that the statute is a special act, the question becomes whether a general act can be made applicable. This is peculiarly a question for the Legislature. *See Battle, supra,* at 735. Here, in light of the economic factors involved, the Legislatue could have deemed the legislation necessary. The history of this statute reveals that the Legislature did consider the issue and consciously decided to restrict the statute's operation to Class I cities. *See J. of the House of Del.,* 62d Leg., Reg. Sess., H.B. 1062, (1975) at 360, 822, 823, 830 and 1177. That determination is one that must be respected by this Court. I would not change this doctrine *sub silentio* as the majority attempts to do in this case.