504 S.E.2d 923

Linda ADKINS, Pamela Chapman, Dorothy Ann Grimmett, West Virginia Education Association, United Mine Workers of America, International Union, West Virginia Citizen Action Group and West Virginia Environmental Council, Appellants,

v.

Robin CAPEHART, Secretary of the West Virginia Department of Tax and Revenue and Tax Commissioner, in his official capacity, Appellee.

No. 24635.

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1998.

Decided July 2, 1998.

Dissenting Opinion of Justice Starcher July 16, 1998.

---

Patrick C. McGinley, Suzanne M. Weise, Morgantown, and Perry McDaniel, Crandall, Pyles & Haviland, Charleston, for Appellants.

Stephen B. Farmer, James S. Arnold, Farmer, Cline & Arnold, Charleston, for Appellees.

PER CURIAM: [1]

Appellants challenge the failure of the Circuit Court of Kanawha County in its order of March 7, 1997, to declare as unconstitutional the method by which the Appellee Secretary of the West Virginia Department of Tax and Revenue (hereinafter referred to as the "Tax Department") currently values coal reserves [2] for purposes of ad valorem taxation. Upon review of this matter, we determine that the order appealed from is not a final order and therefore, this case is dismissed as improvidently granted.

## I. PROCEDURAL HISTORY

Appellants initiated the underlying civil action on March 29, 1996, seeking declaratory, injunctive, and mandatory relief in connection with the methodology employed by the Tax Department to value coal reserves for ad valorem property taxation purposes. Citing article X, section 1 of the West Virginia Constitution, [3] Appellants contend that the current system for valuing coal reserves used by the Tax Department does not result in the constitutionally-mandated fair market value. [4]

In 1995, a lawsuit [5] which similarly sought an end [6] to the allegedly unconstitutional method used to value coal reserves by the Tax Department was filed by the same interests represented in this case. [7] That case was resolved by agreed order on June 22, 1995, the terms of which required the Tax Commissioner to contract with independent consultants to review the Tax Department's reserve coal tax methodology for the purpose of reaching a determination of whether such property was being assessed at its fair market value. Fulfilling the mandate of such order, the Tax Commissioner retained both Resource Technologies Corporation ("RTC") [8] and "Torries and Colyer" as expert tax consultants to evaluate the state's meth-

---

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley,* 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4. (1992).

2. The current method is prescribed by 110 W.Va. C.S.R. 1I § 4.1.9.2 and involves (a) the review of the data of arms-length sales of coal reserves and of the market conditions within each of five regions and (b) the selection of a single regional value per acre for each region which best typifies the sales within that region.

3. Article X, section 1 of the West Virginia Constitution provides, in pertinent part:

   Taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value....

4. Appellants assert that, because a substantial portion of tax revenues collected on coal reserves are used to fund public schools, West Virginia children are being "deprived of the improved facilities, instructional materials and learning environment" that additional tax revenues would provide. Additionally, Appellants contend that the "continued failure to tax reserve coal fairly and equitably undermines crucial public confidence needed to administer a state tax system."

5. A series of newspaper articles published by the *Charleston Gazette–Mail* in August 1994 that addressed the issue of unfair taxation of coal reserves apparently sparked the lawsuit. The articles also prompted then Governor Gaston Caperton to direct the Tax Commissioner to correct certain obvious errors contained within the tax data being used for valuation purposes.

6. In contrast to the current lawsuit which seeks an injunction, a declaratory judgment, and relief in mandamus, the 1995 action only sought a writ of mandamus.

7. *Kermit Lawson, et al. v. James H. Paige, III,* Civil Action No. 95–MISC–43 (Kanawha County Circuit Court). The circuit court observed in its March 7, 1997, order in this case that the plaintiffs common to both the *Lawson* suit and the instant case are the WVEA, the West Virginia Citizens Action Group, the United Mine Workers of America, and the West Virginia Environmental Council.

8. RTC was the plaintiffs' expert in the 1995 *Lawson* case. The Tax Department engaged RTC as a consultant and permitted it to become an integral part of the efforts to implement the 1995 agreed order in the *Lawson* case.

odology of coal reserve valuation. Both experts reported their findings to the Commissioner in October 1995. RTC reported that

> Current methodology has resulted in the development of a "Comparative Sales Database" that is not statistically valid by any acceptable measure of confidence. A series of statistical tests performed by both Torries and RTC showed that the average "values" used by the State could not be used to confidently predict the value of the sales within the data base itself. The data base, as it is currently comprised, is not useful.

Torries and Colyer concluded in their report that "[c]urrently the methodology results in predicted values that differ from actual values on an average of plus or minus 50 percent, but can range up to 600 percent from the actual values."

With regard to the present litigation, the circuit court, in its March 7, 1997, order, observed:

> it appears to be undisputed that the defendant has complied with all of the requirements of the earlier consent decree [*Lawson* case] and that he continues on a schedule, with his consultants, the object of which is to value coal reserve lands more accurately (and in a manner that more closely comports with Constitutional and statutory requirements).

The lower court further opined:

> The plaintiffs have offered no evidence that the defendant is acting in bad faith

with respect to his promise to attempt to improve the method he uses to value coal reserves. They have not attempted to demonstrate that he has been dragging his feet or obstructing the process. Instead, they have continued to articulate, in great detail, the same deficiencies that were identified in the earlier mandamus action. The plaintiffs appear to want the Court to order the defendant to immediately implement a fairer, more constitutional method for valuing coal reserve property but, at no time have they suggested *any* alternative method which could be immediately implemented.

A new methodology for appraising the value of coal reserves was identified by consultants RTC and Torries in their joint report dated June 1, 1997.[9] Based on this new methodology, the Tax Department filed with the Secretary of State's office the Tax Department's "Proposed Legislative Rules, Title 110, Series 1I, Valuation of Active and Reserve Coal Property for Ad Valorem Property Tax Purposes" on June 25, 1997. The proposed rules were submitted to the circuit court along with the Consultant's report.

Appellants made clear on oral argument and through their briefs that their primary remedial concern is the circuit court's failure in its March 7, 1997, order to issue a declaratory judgment finding the Tax Department's current methodology for valuing coal reserves for ad valorem property taxation purposes to be unconstitutional.[10] Based on the jurisdictional challenge raised to our consideration of this matter,[11] we must first determine whether this case is properly before us.

---

**9.** Whereas the current method for valuing coal reserves involves a mass estimate of the value of the individual tax parcels throughout five separate regions of the state, the proposed method employs 1,376,160 regions (235 districts X 61 seams X 4 seam characteristics X 6 mining factors X royalty and price factors X BTU and Sulfur factors). The consultants' 6/1/97 report states that the "proposed model, by considering as many distinguishing factors as possible, significantly lessons the equity issue."

**10.** The Tax Department observed that the circuit court's hesitation to make such a finding, especially in view of the substantial costs expended and extensive efforts undertaken by the Department to seek an improved way of valuing coal reserves, was premised on the lower court's unwillingness to leave this state with no replace-

ment mechanism for valuing this state's coal reserves. The circuit court expressed its concern that a complete cessation of coal reserve tax revenue would result until such time as an alternate method could be proposed, adopted, and implemented. Since, as a general rule, a declaration of a law's unconstitutionality renders the law void, a declaration of a taxing mechanism as unconstitutional would prevent taxes from being collected pursuant to the unconstitutional mechanism. *See State ex rel. City of Charleston v. Bosely*, 165 W.Va. 332, 344–45, 268 S.E.2d 590, 598 (1980).

**11.** This issue was first raised by the Tax Department in a motion to dismiss Appellants' petition for appeal. This Court denied the motion to dismiss on the basis of lack of jurisdiction but did so "without prejudice with leave to raise the issue in oral argument."

## II. RULE OF FINALITY

■ The Tax Department argues that by its very language the March 7, 1997, order appealed from does not qualify as a final order [12] and therefore, this Court is without jurisdiction over this matter. The order appealed from states:

it is therefore ORDERED that this action shall be retained on the active docket of this court for the purpose of monitoring the progress of the West Virginia Department of Tax and Revenue toward the development of an alternative method of valuing coal reserve land within this State. It is further ORDERED that the defendant shall file with this court and serve on opposing counsel any interim reports and any recommendations of the consultants, Resource Technologies Corporation and Torries and Associates as well as any proposed changes to the rules or regulations of the Department which relate to the valuation of coal reserve land.

It is further ORDERED that either party may request a hearing before the court for any purpose related to the issues involved, including, but not limited to a request to modify the terms of this order or to dismiss this action.

■ Appellate jurisdiction, as we explained in syllabus point three of *James M.B.* v. *Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995), is controlled by the rule of finality:

Under W.Va.Code, 58–5–1 (1925), appeals only may be taken from final decisions of a circuit court. A case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined.

While certain exceptions to this rule of finality [13] exist, such as matters involving prohibition, certified questions, a Rule 54(b) judgment order,[14] or the "collateral order" doctrine,[15] we find none of those exceptions to exist in the instant case.

Appellants take the position that the March 7, 1997, order leaves nothing to be resolved and therefore qualifies as a final order. We cannot reach the same conclusion as the circuit court's order clearly contemplates additional review, if only in the nature of monitoring the progress of proposed methodology changes,[16] and further provides for continuing jurisdiction over the matter for "any purpose related to the issues involved, including" requests for modification or dismissal. As such, we determine that this Court does not have jurisdiction over this matter under well-established principles that require the issuance of a final order as a prerequisite to appellate review.[17]

---

**12.** As we noted in *Durm v. Heck's, Inc.*, 184 W.Va. 562, 401 S.E.2d 908, "[a] statutory right to appeal arises in a civil case following the entry of a 'final judgment, decree or order.' " *Id.* at 566, 401 S.E.2d at 912, n. 3 (quoting W.Va.Code § 58–5–1(a) (1966)).

**13.** *See James M.B.*, 193 W.Va. at 292, 456 S.E.2d at 19 (stating that "the 'rule of finality,' is designed to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]' ") (quoting *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982)).

**14.** *See James M.B.*, 193 W.Va. at 292, 456 S.E.2d at 19 n. 3.

**15.** To come within the narrow exception of the "collateral order" doctrine, the order appealed from must (1) be conclusive; (2) resolve significant issues separate from the merits; and (3) render those significant issues " 'effectively unreviewable on appeal from final judgment on the underlying action.' " *Coleman v. Sopher*, 194 W.Va. 90, 96, 459 S.E.2d 367, 373 n. 7 (1995) (citing *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994)).

**16.** The Tax Department points out that it has twice supplemented the lower court's record in this case by submitting information in the nature of interim reports and proposed rule changes as required by the March 7, 1997, order.

**17.** In addition, we note another jurisdictional impediment to Appellants' request for a declaratory judgment ruling. As this Court held in *Trail v. Hawley*, 163 W.Va. 626, 259 S.E.2d 423 (1979), "for the purposes of a declaratory judgment action, a justiciable controversy exists when a legal right is claimed by one party and denied by another." *Id.* at 628, 259 S.E.2d at 425. Since Appellants contend that the Tax De-

*See James M.B.*, 193 W.Va. at 291, 456 S.E.2d at 18, syl. pt. 3; *accord Coleman v. Sopher*, 194 W.Va. 90, 94, 459 S.E.2d 367, 371 (1995); *Parkway Fuel Serv., Inc. v. Pauley*, 159 W.Va. 216, 219, 220 S.E.2d 439, 441 (1975).

Having concluded that Appellants' petition for appeal was not properly before this Court due to the absence of an appealable final order, we hereby dismiss this case as improvidently granted.

Case dismissed.

STARCHER, Justice, dissenting:

(Filed July 16, 1998)

In 1995, in the predecessor case to the instant case, the United Mine Workers of America, the West Virginia Education Association, the West Virginia Citizen Action Group and the West Virginia Environmental Council joined with several individual citizens to assert the claim that West Virginia's present system for valuing, assessing and taxing coal reserves is unconstitutional.

This is not an abstract issue. These plaintiffs have a lot at stake in the taxation of coal reserves. Unconstitutionally low taxation of coal reserves means less money for public education, for environmental protection, and for worker retraining—to name a few important concerns of the plaintiffs. And if some coal reserve property is taxed at more than its fair market value, then thousands of West Virginia property owners are paying more taxes on their coal than they should.[1]

In the 1995 case, the State Tax Department vigorously denied the plaintiffs' charge that the present system is inaccurate or unconstitutional. The 1995 case settled when the Tax Department offered to conduct a study of the present system. The plaintiffs

went along, confident that the study would show that the plaintiffs were correct.

The plaintiffs' confidence was not misplaced. The Tax Department study concluded unequivocally that the present system does not value and assess coal reserves at fair market value.[2] This means that it is unconstitutional, under article X, section 1 of the *West Virginia Constitution. See Killen v. Logan County Comm'n*, 170 W.Va. 602, 295 S.E.2d 689 (1982).

After the study was released, the Tax Department developed a proposal to change the system. The Department submitted the proposed changes to the 1998 Legislature, along with the Department's critique of the present system. That critique said that the present system "doesn't work."

The Legislature failed to change the present system. In the meanwhile, the plaintiffs went back to court in the instant case, again seeking a declaration by the circuit court that the system is unconstitutional, and an order requiring the Department to implement a system that passes constitutional muster.

After the plaintiffs presented their case to the circuit court, in which the evidence of the present system's unconstitutionality was essentially unrefuted, the circuit court entered an order denying the plaintiffs any relief. That is the order that we review today. The circuit judge said, in a cover letter that accompanied the court's order: "An order has been entered today *which resolves all the issues in controversy.*" (Emphasis added.)

The circuit judge was entirely correct in stating that his order resolved (albeit adversely to the plaintiffs) all of the claims made by the plaintiffs.

First, the plaintiffs had asked for a declaratory judgment saying that the Tax Depart-

---

partment has finally acknowledged, albeit implicitly, that its current methodology does not result in the constitutionally-mandated fair market valuation, there is arguably no longer a legal right claimed by one side that is being denied by the other.

1. Moreover, the interests of all citizens of West Virginia are affected by the State's system of coal reserve tax valuation and assessment. "If one party is not required to pay taxes based on market value of coal reserves and thus is underassessed, the resulting injury is to all other members of the taxing district who are subjected to discriminatory assessment and denied the benefits of full and equitable taxation." *Tug Valley*

*Recovery Center, Inc. v. Mingo County Comm'n*, 164 W.Va. 94, 105, 261 S.E.2d 165, 172 (1979).

2. For example, for large-acreage coal reserves purchased by coal companies: reserves that sold for 26.3 million dollars were valued by the Tax Department's current methodology at 6.2 million dollars; reserves that sold for 11.3 million dollars were valued at 2.3 million dollars; reserves that sold for 13 million dollars were valued at 1.5 million dollars; and so forth for numerous properties. On the other hand, the Tax Department valued many small coal acreages, not purchased by coal companies for their reserves, at far above the actual purchase prices.

ment's present method was unconstitutional. The circuit court's order refused this request. Second, the plaintiffs had asked for an injunction against the further use of an unconstitutional valuation method. The court's order also denied this request. Third, the plaintiffs had asked for an order requiring the tax commissioner to appraise property at fair market value. The court's order said that the plaintiffs weren't entitled to this requested relief either.

Yes, the plaintiffs had asked the circuit court to "retain jurisdiction" in the case—but only to monitor the compliance of the defendants with an order requiring them to implement a constitutional system. In the absence of any finding by the court that the present system of valuing and assessing coal reserves is unconstitutional, the circuit court had and has no jurisdiction to keep the case before the court.

To summarize, the circuit court's order was a *final* and resounding "no" to each of the plaintiffs' requests. As the saying goes—what part of "no" don't we understand?

Thus, because the circuit court's order is an appealable "final order," the majority is wrong in its stated rationale for failing to review the merits of the circuit court's refusal to grant the plaintiffs' requested relief.

Turning briefly to the merits of that refusal, it appears that the circuit court may have been concerned that declaring the present system to be unconstitutional—although such a ruling would be entirely supported and indeed is compelled by the evidence—would

jeopardize tax collections until a proper system is put in place.

But there is no merit in such a fear, because a declaration of unconstitutionality does not in itself mean that the existing system must be immediately scrapped. This principle is illustrated by the decisions in which this Court held that the conditions of confinement at the Moundsville prison were unconstitutional. *See, e.g., Crain v. Bordenkircher,* 182 W.Va. 787, 392 S.E.2d 227 (1990).

Although the conditions at Moundsville were unconstitutional, our rulings gave the Executive and the Legislature ample time and deference to plan and build a new facility. And the same should be true with coal reserve valuation and assessment.

But the first step toward any needed change, as in the Moundsville cases, is to decide the constitutionality issue—as these plaintiffs have been asking the courts to do for over three years.[3]

It is interesting to compare the majority opinion in the instant case with this Court's recent ruling in another case that is similar to the Moundsville cases—*State ex rel. Stull v. Davis,* —— W.Va. ——, 508 S.E.2d 122, Nos. 24459 *et al.* (1998).

In *Stull,* this Court determined that prisoners lodged in county and regional jails are being denied their statutory right to be housed in state correctional facilities. We appointed a special master and are requiring development and implementation of a plan to move those inmates.[4]

In *Stull,* this Court was properly protective of the statutory rights of people who are

---

3. Absent such a threshold determination by this Court, what incentive is there for the Tax Department and Legislature to timely develop and implement a constitutional system? What would have happened in 1956, if the United States Supreme Court had said: "It's true that all of the evidence shows that segregated schools are unconstitutional, but because the lower court "kept jurisdiction" (but denied all relief), our hands are tied."? Also, no one closed all of our nation's segregated schools, on the day after *Brown v. Board of Education* was decided. A declaration of unconstitutionality does not result in the immediate collapse of the system in question.

4. It is with great reluctance that I support rulings, however legally correct, that may effectively drive the construction of more prison and jail

beds. In 20 years as a trial judge, I learned (as nearly every judge I know has learned) that prison and jail incarceration is expensive overkill for a substantial percentage of the people who are convicted of crimes.

To put it bluntly, I know beyond the shadow of a doubt that hundreds of the people who are "overcrowding" West Virginia's jails and prisons could be safely, soundly and fully punished for their crimes—without being housed, fed, doctored, and otherwise cared for in costly jails and prisons for which taxpayers have to pay.

So I find it hard to "enable" the construction of more prison beds, when I am sure that a significant fraction of the existing beds are being wasted (e.g., recently in Kanawha County two men were jailed—one for fishing without a li-

convicted of crimes. But in the instant case, the majority shows little inclination to protect the constitutional rights of school teachers, union coal miners, environmentally concerned citizens, small property owners, and taxpayers generally.

What explains the difference in the two cases' approaches?

I believe that any attempt at answering this question would be pointless, speculative, and counterproductive. Instead, I look to the future. "Hope springs eternal in the human breast." Alexander Pope, *An Essay on Man* (1733–34).

So, my hope is that the plaintiffs in the instant case will go back to the circuit court and vigorously press their request that the circuit court directly rule—up or down—on

the constitutionality of this state's coal reserve valuation and assessment system. If the circuit court still will not make such a ruling, I hope that the plaintiffs will ask for mandamus relief from this Court, to require the circuit court to rule.

And if this Court faces these issues again, I hope that we will choose to give the same consideration and protection to the rights of law-abiding taxpayers that we give to the rights of incarcerated criminals. Both are deserving of and entitled to our attention.

For the foregoing reasons, I dissent from the court's decision to dismiss the appeal.

cense, the other for possessing fishing paraphernalia). I fear that once built, these beds will be filled without much regard for whether they are really needed. The demographics of our state suggest strongly that we are an aging population. What will result is a diminished need for prison beds in the future.

As a citizen, lawyer, parent, husband, property owner, taxpayer and judge, the maximum possible use of alternatives to imprisonment appeals to me because it means my taxes can go to support more productive activity, like building good schools and providing medical care for children and the elderly. Another attractive aspect of the use of alternative punishment is that

less people get to receive the highly effective, publicly-funded, graduate education in criminal behavior that jails and prisons offer.

I note that in *Stull*, this Court has not required the prisoners at the regional and county jails to come up with a plan to create space for them in the state prisons. That is the job of jail and prison authorities. In the instant case, the circuit court faulted the appellants for not themselves offering a "better" system for coal reserve tax valuation. Following *Stull*, we should not uphold a requirement that school teachers develop and implement a plan to tax coal reserves fairly. That is the job of the Tax Department and the Legislature.