459 S.E.2d 367

**Mary COLEMAN, et al., Plaintiffs Below, Appellants,**

v.

**Irvin SOPHER, Defendant Below, Appellee.**

**No. 22592.**

Supreme Court of Appeals of West Virginia.

Submitted May 16, 1995.

Decided June 15, 1995.

---

Barbara H. Allen, Joseph C. Cometti, Allen & Allen, Charleston, for appellants.

Charles F. Johns, Amy Smith, Steptoe & Johnson, Clarksburg, for appellee.

CLECKLEY, Justice:

The plaintiffs below and appellants herein, Mary Coleman, J. Wesley Coleman, and Michelle Coleman, appeal from the circuit court's use of remittitur to reduce the amount of their jury award. The defendant below and appellee herein, Dr. Irvin Sopher, asserts that remittitur was proper and cross-assigns that the circuit court committed various other errors that prejudiced the defendant at trial. The circuit court at the request of the defendant and the acquiescence of the plaintiffs granted a new trial on the issue of damages. Before the commencement of the new trial, both parties filed a petition for appeal with this Court. As a result of the pending action in the circuit court, we find the petition for appeal was improvidently granted and this appeal must be dismissed for lack of appellate jurisdiction.

## I.

### FACTS AND PROCEDURAL BACKGROUND

On September 26, 1987, Elmer Coleman collapsed at home from a heart attack. An ambulance rushed Mr. Coleman to Montgomery General Hospital, where an emergency room physician pronounced him dead on arrival.[1] Mrs. Coleman arrived at the hospital sometime later. Hospital staff asked Mrs. Coleman whether she wanted an autopsy performed on Mr. Coleman. Mrs. Coleman consented to the autopsy after Mr. Coleman's father told her she might have a claim for occupational pneumoconiosis benefits as a result of Mr. Coleman's years of working in the coal mines. Mrs. Coleman thought an autop-

---

1. Mr. Coleman is survived by his wife, Mary, and his two children, J. Wesley and Michelle.

sy might indicate whether occupational pneumoconiosis contributed to her husband's death.

Later that day, Mr. Coleman's body was transported to the Office of the Chief Medical Examiner of West Virginia. Dr. Irvin Sopher, the Chief Medical Examiner, performed an autopsy the next day. Mr. Coleman's body was then transported to Combs–Pennington Funeral Home where the owner, Paul Pennington, embalmed the body. The funeral occurred without incident.

Sometime later, Mrs. Coleman applied for occupational pneumoconiosis survivor benefits. After her claim was refused, Mrs. Coleman's attorney, Heidi Kossuth, collected additional medical information on Mr. Coleman. The autopsy report prepared by Dr. Sopher contained no findings helpful to the occupational pneumoconiosis claim since it stated there was no indication that Dr. Sopher examined the lungs. The following phrase, however, was recorded on the report: " 'The heart is not removed from the body[.]' " Ms. Kossuth informed Mrs. Coleman that the present medical reports did not show occupational pneumoconiosis and a second autopsy might produce the necessary evidence to support a claim for benefits. Mrs. Coleman consented to the second autopsy.

On September 13, 1989, Dr. Echols Hansbarger performed a second autopsy. After inspecting the thoracic cavity, Dr. Hansbarger's report noted he found no evidence of pneumoconiosis. The report also stated "the heart is not identified or found." After Mrs. Coleman became distraught over the report's revelation as to the missing heart, Ms. Kossuth called Dr. Sopher. According to Mrs. Coleman, Dr. Sopher later called her and told her that he was not sure, but he thought he had given the heart to Mr. Pennington to put back into the body during the embalming.

Mrs. Coleman subsequently filed suit naming Dr. Sopher and Mr. Pennington as defendants. The complaint alleged either Dr. Sopher or Mr. Pennington concealed the fact that the heart was removed from the body. Three causes of action were alleged: (1) intentional infliction of emotional distress, (2) outrageous conduct, and (3) conversion. The complaint cited as damages the fact that Mrs. Coleman and the Coleman children suffered "emotional pain and suffering, anxiety and depression[.]" The Colemans sought both compensatory and punitive damages.

At a status conference, the circuit court announced that it intended to grant summary judgment to the defendants on the ground that the plaintiffs could not "legally maintain this action against two Defendants alleging that one or the other Defendant, but not both, are liable to the Plaintiff[s]." The circuit court permitted the plaintiffs leave to amend the complaint naming one of the two defendants. The circuit court entered a summary judgment for Paul Pennington after the Colemans decided to pursue the suit against Dr. Sopher. Dr. Sopher brought Mr. Pennington back into the suit by filing a third-party complaint.

At trial, the three plaintiffs gave detailed testimony about their emotional distress. Mr. Pennington made a motion for a directed verdict at the conclusion of the plaintiffs' case. The circuit court ultimately granted this motion. Subsequently, Dr. Sopher took the stand and denied removing the heart. However, during cross-examination, Dr. Sopher admitted he had published several articles about a condition called myocarditis, which is an inflammation of the heart muscle. He also admitted to occasionally securing for research heart tissue samples from autopsies. Further testimony revealed that patients suffering from myocarditis experience symptoms like a chest cold and sore throat. One of the exhibits introduced by Dr. Sopher indicated that Mr. Coleman suffered from chest pain and indigestion before collapsing.

The jury returned a verdict in favor of the plaintiffs. The Colemans were awarded a total of $185,000 in compensatory and punitive damages. After trial, Dr. Sopher filed motions for a new trial, judgment notwithstanding the verdict, and remittitur. In support of the motions, Dr. Sopher asserted, among other things, that the verdict was "incited by jury passion and prejudice." The circuit court denied all the post-trial motions, except for remittitur. The circuit court gave the plaintiffs the option of accepting a reduc-

tion in their damage award or a new trial on damages. The circuit court proposed reducing Mrs. Coleman's compensatory damages from $75,000 to $50,000 and each of the children's compensatory damages from $30,000 to $10,000. There was to be no reduction in the $50,000 punitive damage award. The circuit court granted a new trial on damages when the plaintiffs rejected the proposal.

On appeal, the plaintiffs assert the circuit court lacked the authority to apply remittitur to this case. The defendant argues remittitur was appropriate and cross-assigns that the circuit court erred by (1) rejecting his claim of governmental immunity from prosecution, (2) violating Rule 404(b) of the West Virginia Rules of Evidence by admitting testimony about his tissue donations to Marshall University Medical School in the past, and (3) permitting the plaintiffs' claim for punitive damages.

## II.

### DISCUSSION

The plaintiffs argue the circuit court improperly applied remittitur to their compensatory damage awards. The circuit court presumably determined the size of the compensatory portion of the verdict was excessive. The circuit court gave the plaintiffs the option of having a new trial on the issue of damages or accepting a remittitur which would lower the amount of compensatory damages by $65,000. The plaintiffs opted for a new trial. Nevertheless, the plaintiffs appeal the remittitur, which they now suggest was done in anticipation of an appeal by the defendant. The defendant cross-assigns various errors.

On our own initiative, we question our jurisdiction to hear any of the issues on appeal. We find that in absence of a final order, this case is not ripe for appeal and is thereby dismissed for lack of jurisdiction.

■ Our analysis must necessarily begin with our seminal case of *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995), where we declared this Court has a duty to examine its own jurisdictional authority even if it is not raised by the parties. In Syllabus Points 1 and 2 of *James M.B.*, we stated:

"1. A court of limited appellate jurisdiction is obliged to examine its own power to hear a particular case. This Court's jurisdictional authority is either endowed by the West Virginia Constitution or conferred by the West Virginia Legislature. Therefore, this Court has a responsibility *sua sponte* to examine the basis of its own jurisdiction.

"2. Where neither party to an appeal raises, briefs, or argues a jurisdictional question presented, this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case. Parties cannot confer jurisdiction on this Court directly or indirectly where it is otherwise lacking."

Thus, given the procedural history of the present case and an outstanding order granting a new trial as agreed to by the parties, we are obligated to first determine if we have jurisdiction to entertain the merits of the appeal.

■ To determine whether this Court has jurisdiction, we further held in Syllabus Point 3 of *James M.B.*, *supra:*

"Under W.Va.Code, 58–5–1 (1925), appeals only may be taken from final decisions of a circuit court. A case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined." [2]

■ The usual prerequisite for our appellate jurisdiction is a final judgment, final in respect that it ends the case. *Parkway Fuel Serv., Inc. v. Pauley*, 159 W.Va. 216, 219, 220 S.E.2d 439, 441 (1975). Here, with the acquiescence of the plaintiffs, the order granting

---

2. In relevant part, W.Va.Code, 58–5–1, provides:
   "A party to a controversy in any circuit court may obtain from the supreme court of appeals, or a judge thereof in vacation, an appeal from, or a writ of error or supersedeas to, a judgment, decree or order of such circuit court in the following cases: (a) In civil cases where the matter in controversy, exclusive of costs, is of greater value or amount than one hundred dollars, wherein there is a *final judgment, decree or order* [.]" (Emphasis added).

the defendant's motion for a new trial, far from ending the case, requires both parties to go forth on the damage issue again.[3] Our review of W.Va.Code, 58–5–1(a) (1925), indicates that appeals to this Court only may be taken from "a final judgment" of a circuit court. We recognize that the statute does permit appeals from interlocutory rulings, such as "[i]n any civil case where there is an order granting a new trial or rehearing, and in such cases an appeal may be taken from the order without waiting for the new trial or rehearing to be had[.]" W.Va.Code, 58–5–1(i) (1925).

■■■■ We must decide whether a party who acquiesced in and/or requested a new trial can take advantage of this subsection of the statute and file an appeal. We hold that when a party agrees to or requests a new trial, rather than resist both the new trial and the remittitur, "[d]enial of appellate review is justified on the ground that the party has 'elected' to accept" the new trial "and should be bound, as if it entered a settlement agreement." Fleming James, Jr., Geoffrey C. Hazard, Jr. & John Leubsdorf, *Civil Procedure* § 7.29 at 402 (4th ed. 1992).[4] Allowing the plaintiffs to appeal this narrow issue would serve no useful purpose. Even if the plaintiffs are successful, the victory would merely get that to which they are already entitled—a new trial—to which both parties have already agreed.[5]

■■ The plaintiffs' assignment regarding the remittitur is anomalous because it is directed to an issue that no longer exists in the case and because the plaintiffs have already received the best they can get from this Court—a new trial on damages. In *In re State Public Building Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994), we said the authority to grant a new trial based on the sufficiency of the evidence resides in the exercise of sound discretion of the trial court and will only be disturbed if the trial court abuses that discretion. Thus, we are cognizant that a new trial may be granted even when judgment as a matter of law is inappropriate.

Perhaps the plaintiffs perceive there is some sort of litigating advantage in seeking to convince the circuit court (or this Court) to review an issue that is nonexistent, but it certainly eludes us. To be sure, plaintiffs' quarrel with the circuit court's proposal is based on the claim that the circuit court has no authority to order a remittitur. While we take seriously the responsibility of an appellate court to review the sufficiency of the evidence to support an award of damages, at this juncture, it makes absolutely no sense to seek to reverse the circuit court on a remittitur decision that was already set aside.

■■■■ Alternatively, even had the plaintiffs not agreed to the new trial, it is unlikely this Court would have granted them appellate relief.[6] Rule 59 of the West Virginia

---

3. As we concluded in *James M.B.*, only a final decision by a circuit court may be appealed. "This rule, commonly referred to as the 'rule of finality,' is designed to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]'" *James M.B.*, 193 W.Va. at 292, 456 S.E.2d at 19, *quoting United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 3082, 73 L.Ed.2d 754, 756 (1982).

4. The defendant, on the other hand, has no statute which he may arguably rely upon to assert appellate jurisdiction. There is no final judgment as to the defendant; he does not seek to appeal the granting of a new trial on the issue of damages, but, to the contrary, moved for the new trial; and there has not been an attempt to invoke any of our other jurisprudential exceptions to establish appellate jurisdiction as we discussed in *James M.B. v. Carolyn M.*, 193 W.Va. at 292–93 nn. 3 & 4, 456 S.E.2d at 19–20 nn. 3 & 4.

5. Although not argued by the parties, there is some support for permitting the party agreeing to the new trial an opportunity to appeal only by cross-appeal. *See* Note, 76 Colum.L.Rev. 299, 324 (1976). Under this theory, the plaintiffs could seek to have the appellate court reinstate the original verdict only if the defendant sought to obtain reversal of the granting of the new trial. In this action, however, the defendant does not seek to have the granting of the new trial reversed, but seeks reversal of the judgment for entirely different reasons.

6. Another possible alternative ground for dismissing an appeal is lack of standing. Section 3 of Article VIII of the West Virginia Constitution refers to the word "controversy" in discussing our appellate jurisdiction. One of the incidents of Section 3's controversy requirement is that a litigant have "standing" to challenge the action sought to be adjudicated on appeal. Standing, in turn, is comprised of three elements: First, the

Rules of Civil Procedure grants a circuit court the authority to vacate a jury's verdict and award a new trial "to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law." In Syllabus Point 3, in part, of *In re State, Public Building Asbestos Litigation, supra,* we noted:

> "[T]he trial judge has the authority to weigh the evidence and consider the credibility of the witnesses. If the trial judge finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion."

As stated above, when a motion for a new trial is made, Rule 59(a) gives the circuit court authority to grant a partial new trial. We are not asked by the parties to review this portion of the order. Thus, we accept the circuit court's judgment on this issue.[7]

As a reminder to future appellants, we point out that an explicit statement or implicit suggestion in the briefs that there exists an appealable order when, in fact, there is no final order is misleading. Appellants are required to determine the existence of an appealable order before attempting to invoke the appellate jurisdiction of this Court. Failure to do so not only wastes the precious and limited resources of this Court, but also those of the lawyers and their clients. We do not wish to be perceived as "sticklers, precisians, nitpickers, or sadists. But in an era of swollen appellate dockets, courts are entitled to insist" on diligence and good faith efforts from the practicing bar so that the appellate decisional process can proceed as it should. *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (1995). Appealing cases that we have no jurisdiction to hear and not disclosing at the time the petition is presented the actual status of proceedings below increases the opponent's work and our work and delays the lower court's efforts to bring the case to a final disposition.

Accordingly, we find the petition for appeal was improvidently granted and the appeal must be dismissed.

Appeal dismissed.

---

party, the plaintiffs herein, must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

Two of these elements are important for purposes of our discussion. The case before us concerns the first and third elements. Once a party receives the benefit of his or her bargain in the lower court, his or her remaining interest is simply insufficient to confer standing. Common to this threshold is the requirement that a party establish, at a minimum, "injury in fact" to a protected interest. Similarly, upon retrial of the damage issue, all issues that we are asked to consider on appeal are subject to change. Thus, the interests the parties seek to protect on this appeal are not " 'actual or imminent' " but are " ' "conjectural or hypothetical." ' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). (Citations omitted).

Because most of the issues presented on this appeal are likely to arise again at trial, we encourage the trial court to take a careful look at

all post-verdict motions and to make specific findings supporting its conclusions. We are particularly concerned with the lack of findings regarding the issues raised by the defendant.

7. To exhaust the issue of our appellate jurisdiction, we do not find the issues raised in this case meet the criteria of the "collateral order" exception, as discussed in *Durm v. Heck's, Inc.,* 184 W.Va. 562, 401 S.E.2d 908 (1991). In note 2 of *Durm,* 184 W.Va. at 566, 401 S.E.2d at 912, relying upon the language in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), we acknowledged that an order might nevertheless be appealed as a "final decision" if it fits within the "collateral order" doctrine. We recognize this is a narrow exception, including only those orders "that are conclusive, that resolve important questions completely separate from the merits, and *would render such important questions effectively unreviewable on appeal from final judgment in the underlying action.*" *Digital Equip. Corp. v. Desktop Direct, Inc.,* — U.S. —, —, 114 S.Ct. 1992, 1995–96, 128 L.Ed.2d 842, 849 (1994). (Emphasis added). Although the issue of statutory immunity could conceivably qualify, we are reluctant to invoke this doctrine in a case where there has been no request to do so and in light of our ironclad rule against piecemeal appeals.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., and FOX, Judge, sitting by temporary assignment.