679 S.E.2d 660

**Euna ROBINSON, Plaintiff Below, Appellee**

v.

**James PACK, Defendant Below, Appellant.**

**No. 34340.**

Supreme Court of Appeals of West Virginia.

Submitted April 7, 2009.

Decided June 18, 2009.

Anthony F. Serreno, Charleston, WV, for the Plaintiff Below.

Jeffrey K. Phillips, Teresa A. Kleeh, Steptoe & Johnson, PLLC, Charleston, WV, for the Defendant Below.

McHUGH, Justice:

This case is before us on certified questions and presents issues regarding the availability of qualified immunity for police officers arising from the alleged unlawful arrest and detention of Appellee Euna Robinson following a 911 dispatch. Initially, we are asked to determine whether a trial court's ruling denying the defense of qualified immunity to a government official is subject to interlocutory appeal. Also presented for our resolution is the issue of whether, as part of an immunity analysis, the subjective motivations of law enforcement officers are relevant when examining the reasonableness of actions taken in connection with allegations of unreasonable search and seizure, unlawful detention, and the use of excessive force. Finally, we are asked to decide whether a supervising police officer can be held civilly liable for the wrongful conduct of his or her subordinate officers.

## I. Factual and Procedural Background

Appellee represents that she has been suffering from and seeking help for mental illness since 1970. On April 4, 2002, Ms. Robinson telephoned Logan–Mingo Mental Health, indicating that she was in distress

and needed help. Believing that Ms. Robinson intended to harm herself, Tina Christenson, an employee of Logan–Mingo Mental Health, called a Mingo County 911 dispatcher and requested assistance for Appellee.[1] In response to this call, the 911 center dispatched deputies from the Mingo County Sheriff's Department, including Appellant James Pack, the chief deputy (hereinafter sometimes referred to as "Chief Pack").

According to the circuit court, the following undisputed facts reflect the chain of events that ensued when the police arrived at Ms. Robinson's residence:

[T]he police were confronted with a plaintiff [Ms. Robinson] who ignored repeated verbal requests to appear. The deputies advised plaintiff that they were there to check on her. The plaintiff never responded to the deputies' requests to unlock her front or back door.

Upon receiving no response from plaintiff, deputies, including Chief Pack, entered plaintiff's residence to ensure she was not in danger. Plaintiff claims Chief Pack directed the responding deputies to remove plaintiff from the residence. Plaintiff continued to refuse to appear or respond to their inquiries.

Plaintiff hid in a small crawlspace in her residence and refused to respond to officers' requests to come out. Plaintiff had been drinking alcohol to excess around the time of the incident and kept multiple loaded guns, swords, and knives in her residence. The deputies saw evidence of the drinking and some of the weapons. Being unable to visualize plaintiff to ensure she was not in possession of a weapon, a deputy advised that a police canine would be released if plaintiff did not show herself. Again, plaintiff did not respond. The canine located plaintiff in the attic's crawlspace, where she was hiding underneath comforters and blankets.

The dog, handled by a deputy not a defendant in this case, allegedly bit plaintiff on the head. However, plaintiff continued to refuse to leave the crawlspace or demonstrate that she did not possess a weapon. Deputies, not including Chief Pack, entered the tight quarters of the crawl space, but were unable to remove the plaintiff. When the deputies backed out of the crawl space, the plaintiff was told pepper spray would be administered if she did not show she was not in possession of a weapon and leave the crawl space. Once again, the plaintiff refused to respond. A deputy directed pepper spray into the crawlspace, resulting in the successful extrication of plaintiff. She was then handcuffed and taken to an awaiting ambulance. Notably, defendant James Pack did not arrest the plaintiff or touch her in any offensive or harmful way on April 4, 2002.

Following Appellee's arrest, she was taken to the sheriff's office to await a mental hygiene evaluation. The examining physician, Dr. Carlos Rivas, concluded that Ms. Robinson "was mentally ill and [was] a danger to herself or others." Dr. Rivas diagnosed Appellee as suffering from a major depressive disorder, displaying psychotic features, having suicidal ideations, and being a substance abuser. Despite the determination by Dr. Rivas that Appellee was mentally ill and likely to cause harm to herself or others, the Mental Hygiene Commissioner decided that Ms. Robinson did not require hospitalization and that she could be managed with outpatient care.

On April 3, 2003, Appellee instituted a civil action against Chief Pack, additional police officers, and various other law enforcement-related entities.[2] Ms. Robinson asserted that she was subjected to unlawful detention, excessive force, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and abuse of process in connection with the events that transpired on April 4, 2002. Through a motion for summary judgment filed on March 1, 2006, Chief Pack argued his entitlement to judgment as a matter of law based on the lawful nature of the

---

1. According to the 911 call sheet, Ms. Christenson indicated that Ms. Robinson "might have hurt herself, [as] she advised mental health that she was in a lot of pain."

2. Also named as defendants were the town of Delbarton, the State Police, and the Sheriff of Mingo County.

actions taken by the police officers and his lack of personal involvement with the use of the police canine, the pepper spray, or the presentment of Ms. Robinson to the mental hygiene commissioner.[3] In addition, Chief Pack asserted his entitlement to both qualified and statutory immunity based on his employment status as a government official.[4]

In responding to Appellant's motion for summary judgment, Ms. Robinson argued that a jury should decide if the motivation for the events surrounding her arrest on April 4, 2002, was a telephone call that she made earlier that same day, during which she informed Chief Pack's wife of an affair between herself and Appellant. Based on its determination that the lawfulness of Appellee's arrest was dependent upon the motivations of Chief Pack, the trial court denied Appellant's motion for summary judgment.[5]

Through its order of March 28, 2008, the Circuit Court of Kanawha County certified the following three questions to this Court:

1. Is a government official entitled to an immediate appeal of the denial of a motion for summary judgment that is based upon qualified immunity?

2. Are the alleged subjective motivations of a police officer relevant to an analysis of the reasonableness of an entry into a residence, the detention of the occupant of the residence, and the alleged use of force upon the occupant?

3. Is a supervising police officer civilly liable for the alleged wrongful conduct of his or her subordinate officers?

With regard to each of the certified questions, the trial court indicated an affirmative response. By order dated September 25, 2008, this Court accepted the certified questions and docketed the matter for resolution.

## II. Standard of Review

As we previously recognized in syllabus point one of *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996), "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." We proceed to address the questions certified to us from the circuit court.

## III. Discussion

### A. Immediate Appeal

The first question presented by the certification order addresses the procedural issue of whether a trial court's denial of qualified immunity is subject to immediate appeal. The trial court and Appellant both view a ruling on the availability of qualified immunity as falling within that narrow category of orders that are subject to permissible interlocutory appeal. Ms. Robinson takes a converse position, arguing that immediate appeal is not permitted because this Court has not expressly ruled in favor of immediate appeal from an adverse ruling on the issue of immunity.

In *Hutchison v. City of Huntington*, 198 W.Va. 139, 479 S.E.2d 649 (1996), an opinion authored by Justice Cleckley, this Court acknowledged the need for early resolution of immunity rulings: "We agree with the United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial." *Id.* at 147, 479 S.E.2d at 657. Although we observed in *Hutchison* that the high court views pretrial immunity rulings as "immediately appealable under the collateral order doctrine," we did not decide whether the denial of a dispositive motion [6] based on qual-

---

**3.** Chief Pack also asserted that there were no genuine issues of material fact to be resolved.

**4.** *See* W.Va.Code §§ 29–12A–5(a)(5), (b) (2008) (extending immunity to employees of political subdivision for methods of providing law enforcement); *State v. Chase Securities, Inc.*, 188 W.Va. 356, 362, 424 S.E.2d 591, 597 (1992) (noting distinction between entitlement of public officials to absolute and qualified immunity).

**5.** By order entered on May 6, 2006, the trial court denied Chief Pack's motion for summary judgment. Appellant later renewed this motion and oral argument was heard by the trial court on January 4, 2007. Although the trial court orally denied the renewed summary judgment motion, the record does not contain an order memorializing this ruling.

**6.** We are referring to rulings made in connection with motions to dismiss or motions for summary

ified immunity is subject to interlocutory appeal in this state.[7] 198 W.Va. at 147, 479 S.E.2d at 657 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); *accord Parrish v. Cleveland,* 372 F.3d 294, 301 (4th Cir.2004) (holding that "a district court's order denying a defendant's claim of qualified immunity is a qualifying order under the collateral order doctrine and thus is reviewable immediately"); *see also Behrens v. Pelletier,* 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (recognizing that "an order rejecting the defense of qualified immunity at *either* the dismissal stage *or* the summary judgment stage is a 'final' judgment subject to immediate appeal") (emphasis in original).

■ Objections to allowing an appeal from an interlocutory order are typically rooted in the need for finality. The provisions of West Virginia Code § 58-5-1 (2005) establish that appeals may be taken in civil actions from "a final judgment of any circuit court or from an order of any circuit court constituting a final judgment." *Id.* Justice Cleckley elucidated in *James M.B. v. Carolyn M.,* 193 W.Va. 289, 456 S.E.2d 16 (1995), that "[t]his rule, commonly referred to as the 'rule of finality,' is designed to prohibit 'piecemeal appellate review of trial court decisions which do not terminate the litigation[.]'" 193 W.Va. at 292, 456 S.E.2d at 19 (quoting *U.S. v. Hollywood Motor Car Co.,* 458 U.S. 263, 265, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982)). Exceptions to the rule of finality include "interlocutory orders which are made appealable by statute or by the West Virginia Rules of Civil Procedure, or ... [which] fall within a jurisprudential exception" such as the "collateral order" doctrine. *James M.B.,* 193 W.Va. at 292–93, 456 S.E.2d at 19–20; *accord Adkins v. Capehart,* 202 W.Va. 460, 463, 504 S.E.2d 923, 926 (1998) (recognizing prohibition matters, certified questions, Rule 54(b) judgment

orders,[8] and "collateral order" doctrine as exceptions to rule of finality).

The "collateral order" doctrine, as we explained in *James M.B.,*

> was set forth by the United States Supreme Court in *Cohen [v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)].... In *Durm [v. Heck's, Inc.],* 184 W.Va. at 566 n. 2, 401 S.E.2d at 912 n. 2, we noted the doctrine as an exception to the federal interpretation of Rule 54(b), and we said that under *Cohen,* "[a]n interlocutory order would be subject to appeal under this doctrine if it '(1) conclusively determines the disputed controversy, (2) resolves an important issue completely separate from the merits of the actions, and (3) is effectively unreviewable on appeal from a final judgment.'"

193 W.Va. at 293 n. 4, 456 S.E.2d at 20 n. 4 (citation omitted). The three-factor *Cohen* test governs our determination of whether a qualified immunity ruling falls within the "collateral order" doctrine and is therefore subject to immediate appeal.

■ With regard to the first factor of *Cohen,* which requires that the ruling at issue must be conclusive, "the [trial] court's denial of summary judgment [on the issue of qualified immunity] finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations." *Mitchell,* 472 U.S. at 527, 105 S.Ct. 2806 (emphasis in original). Because a ruling denying the availability of immunity fully resolves the issue of a litigant's obligation to participate in the litigation, the first factor of *Cohen* is easily met. As to the second factor which focuses on whether the immunity ruling resolves significant issues separate from the merits, there is little question that the "claim of immunity is conceptually distinct

---

judgment. *See Hutchison,* 198 W.Va. at 147 n. 9, 479 S.E.2d at 657 n. 9.

7. Because *Hutchison* was before us on appeal, we were not asked to resolve that question. *See also Coleman v. Sopher,* 194 W.Va. 90, 96 n. 7, 459 S.E.2d 367, 373 n. 7 (1995) (noting that statutory immunity could fall under the "collateral order" doctrine but refusing to apply doctrine where parties failed to invoke its use).

8. In our recent decision of *C & O Motors, Inc. v. West Virginia Paving, Inc.,* 223 W.Va. 469, 677 S.E.2d 905 (2009), we applied Rule 54(b) to hold, in part, in syllabus point three that "[a] judgment that does not determine damages is a final appealable order when the computation of damages is mechanical and unlikely to produce a second appeal because the only remaining task is ministerial, similar to assessing costs."

from the merits of the plaintiff's claim that his [or her] rights have been violated." *Id.* at 527–28, 105 S.Ct. 2806. As the high court explained in *Mitchell,* qualified immunity is a pure legal determination that is made independent of the plaintiff's averments:

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

*Mitchell,* 472 U.S. at 528, 105 S.Ct. 2806.

The final factor of the *Cohen* test requires us to consider whether a qualified immunity ruling is "effectively unreviewable" at the appeal stage. Postponing review of a ruling denying immunity to the post-trial stage is fruitless, as the United States Supreme Court reasoned in *Mitchell,* because the underlying objective in any immunity determination (absolute or qualified) is immunity from suit. 472 U.S. at 526–27, 105 S.Ct. 2806; *see also Gray–Hopkins v. Prince George's County, Md.,* 309 F.3d 224, 229 (4th Cir.2002) ("Because qualified immunity is an immunity from having to litigate, as contrasted with an immunity from liability, it is effectively lost if a case is erroneously permitted to go to trial.") (omitting internal citation); *Jenkins v. Medford,* 119 F.3d 1156, 1159 (4th Cir.1997) (observing that denial of qualified immunity defense "subjects the [government] official to the burdens of pretrial matters" and opining that "some of the rights inherent in a qualified immunity defense are [conse-

quently] lost"). Traditional appellate review of a qualified immunity ruling cannot achieve the intended goal of an immunity ruling: "the right not to be subject to the burden of trial." *Hutchison,* 198 W.Va. at 148, 479 S.E.2d at 658. As a result, the third factor of *Cohen* is easily met.

Application of the *Cohen* test demonstrates that a circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the "collateral order" doctrine. Based on this determination, we answer the first certified question in the affirmative.

### B. Subjective Motivation

■ Through the second certified question, we are asked to decide whether the subjective motivations of a police officer are relevant to a qualified immunity analysis. In framing this question, the trial court expressly limited the issue of motivation to three particular claims asserted by Ms. Robinson in her amended complaint: (1) unreasonable search and seizure; (2) unlawful detention; and (3) excessive force.[9] In seeking relief for these three claims, Appellee relies upon various provisions of the state constitution.[10]

■■ Borrowing from the approach used by the federal courts, this Court employs "an objective test for evaluating official conduct under our immunity statutes." *Hutchison,* 198 W.Va. at 148, 479 S.E.2d at 658. The general immunity standard that we adopted in our syllabus of *Bennett v. Coffman,* 178 W.Va. 500, 361 S.E.2d 465 (1987), is the standard first employed by the United States Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982): "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

9. The certified question is specifically framed in terms of questioning the applicability of a police officer's subjective motivation "to an analysis of the reasonableness of an entry into a residence, the detention of the occupant of the residence, and the alleged use of force upon the occupant."

10. Included in the claims asserted by Ms. Robinson in the amended complaint are violations of article III, sections 1, 4, 5, 6, 10, and 14 of the state constitution.

The objective nature of the standard by which we extend qualified immunity to government officials was confirmed in *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In that decision, we affirmed that immunity from personal liability exists "if the involved conduct did not violate clearly established laws of which a reasonable official would have known." Where, however, the cause of action involves "acts [that] are fraudulent, malicious, or otherwise oppressive," we recognized that qualified immunity is not available. *Id.* at 357, 424 S.E.2d at 592, syllabus, in part. In reviewing the development of immunity law with regard to public officials in *Chase Securities*, Justice Miller discussed the need for our state law in this area to conform with federal law. One reason for having a uniform approach to immunity law stems from the fact that federal law is controlling when public officials are sued in state court for violations of federal rights under 42 U.S.C. § 1983.[11] 188 W.Va. at 359–60, 424 S.E.2d at 594–95; *see also State v. Jones*, 193 W.Va. 378, 382 n. 6, 456 S.E.2d 459, 463 n. 6 (1995) (recognizing that we have "traditionally interpreted this section [W.Va. Const. art. III, section 6, prohibiting unreasonable searches and seizures] in harmony with federal case law construing the Fourth Amendment to the United States Constitution").

Federal law leaves no question that the subjective motivations of a police officer are immaterial to a determination of whether qualified immunity exists in connection with allegations of unreasonable search and seizure, unlawful detention, and excessive force. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (holding that officer's subjective beliefs are irrelevant when evaluating the reasonableness of his actions). As the United States Supreme Court reasoned in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989):

[T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* at 397, 109 S.Ct. 1865; *accord Whren v. U.S.*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (stating that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir.1994) (finding that "officer's subjective state of mind is not relevant to the qualified immunity inquiry").

In *S.P. v. City of Takoma Park*, 134 F.3d 260 (4th Cir.1998), a factually apposite decision that involved the involuntary seizure and transporting of an individual for an emergency psychiatric evaluation by law enforcement officers, the Fourth Circuit Court of Appeals examined whether qualified immunity applied to the actions taken by the police. Similar to what occurred in this case, a third party's[12] call to a dispatcher raised concern that the plaintiff was in danger of harming herself and in need of police assistance. *Id.* at 264. Based on the plaintiff's agitated mental state when the police arrived, she was handcuffed, removed from her home, and taken for an emergency evaluation. After two emergency room physicians examined the plaintiff, she was involuntarily admitted for further psychiatric evaluation and care.[13] *S.P.*, 134 F.3d at 265.

At issue in *S.P.* was whether the district court correctly determined that the defendant police officers were entitled to qualified immunity based on the plaintiff's failure to

**11.** Appellee suggests that the body of law that has developed in conjunction with section 1983 actions should not apply because she has not asserted a federal civil rights claim. This argument is specious as her decision to include constitutionally-based claims clearly mandates the application of Fourth Amendment-based jurisprudence.

**12.** Plaintiff's husband called the dispatcher. 134 F.3d at 264.

**13.** Following a complete psychiatric examination, the plaintiff in *S.P.* was determined not to be suffering from any mental disorders. 134 F.3d at 265.

demonstrate that the officers' actions in seizing and detaining her were against established law. 134 F.3d at 263. The plaintiff argued that the police officers had violated her right to be free from seizure for the purpose of medical treatment absent probable cause to believe she suffered from a mental disorder, posed a danger of harm to herself, and that there was no less restrictive alternative available. 134 F.3d at 265–66. After examining whether the police officers' actions met the test of "objective legal reasonableness ... assessed in light of the legal rules that were clearly established," the Fourth Circuit ruled in *S.P.* that "[r]easonable officers ... would have concluded that involuntarily detaining [plaintiff] Peller was not only reasonable, but prudent." *Id.* at 266–67 (omitting internal quotation marks). Dispelling the notion that the defense of qualified immunity can be affected by the mental state of the arresting officers, the court found the officers' lack of knowledge that probable cause was needed to effectuate a lawful detention to be incorporeal. 134 F.3d at 268 n. 5; *see also Telepo v. Palmer Township*, 40 F.Supp.2d 596, 605 (E.D.Pa. 1999) (refusing to deny immunity to police officers based on alleged retaliatory motivation for execution of domestic order "because the qualified immunity inquiry is an objective one, which asks how a reasonable officer would have acted under these circumstances").

As support for her position, Appellee maintains that this Court "has previously dealt with and summarily rejected" the argument that subjective motivations are not relevant to an immunity inquiry. In *Neiswonger v. Hennessey*, 215 W.Va. 749, 601 S.E.2d 69 (2004), a case in which personal injury resulted during a burglary investigation, we reviewed the trial court's dismissal of the plaintiffs' state law claims[14] based on a district court's prior dismissal of the section 1983 action.[15] In deciding that the trial court

wrongly relied upon collateral estoppel to dismiss the plaintiffs' state law claims, we reasoned:

> In the present case, the appellants [plaintiffs] claim that Officer Hennessey and the Morgantown City Police Department committed torts as those torts are defined by West Virginia law, and as they are legally cognizable by West Virginia's courts. Whether the torts have been committed depends upon the intent of the alleged tortfeasor, his recklessness, and whether he followed the prescribed standard of care. Whether the torts have been committed, thus, depends potentially upon the character of the alleged tortfeasor's conduct and upon his state of mind. In the federal action involved in the present case, the federal court looked at the character of the alleged tortfeasors' actions to determine only whether they were objectively reasonable under the Fourth Amendment guarantee that an individual be free from unreasonable searches and seizures. The federal court did not consider whether the alleged tortfeasors' conduct constituted torts as defined by West Virginia law.

215 W.Va. at 753, 601 S.E.2d at 73.

Appellee's reliance on the quoted language from *Neiswonger* is misplaced. While that language addresses the relevance of the alleged tortfeasor's state of mind to various torts, the second certified question is framed *solely* in terms of asking whether the subjective motivations of a governmental officer are relevant to Appellee's constitutionally-based claims.[16] Because the trial court did not ask us to decide whether subjective motivations are material to the tort claims brought by Ms. Robinson, *Neiswonger* is not relevant to the issues presented by the second certified question.

In line with clear federal authority and our prior rulings recognizing that the objective

---

**14.** Those claims included assault, battery, intentional infliction of emotional distress, abuse of process, and negligent and wanton conduct with regard to actions taken by an arresting police officer.

**15.** *See Neiswonger v. Hennessey*, 89 F.Supp.2d 766 (N.D.W.Va.2000) (affirming dismissal of federal civil rights action brought against law enforcement officers and refusing to exercise sup-

plemental jurisdiction of plaintiffs' state law claims).

**16.** The issue presented is whether a police officer's subjective motivations bear upon the reasonableness of his entry into a residence, his detention of an occupant, and his use of force upon the occupant.

legal reasonableness of questioned actions in light of clearly established law is the test for evaluating conduct for purposes of an immunity analysis, we hold that the subjective motivations of a police officer are not relevant to a determination of whether qualified immunity exists in connection with allegations of an unreasonable search and seizure, an unlawful detention, or the use of excessive force. *See Hutchison*, 198 W.Va. at 148–49, 479 S.E.2d at 658–59. Based on this determination, we answer the second certified question in the negative.

### C. Supervisory Liability

■ The third certified question involves the issue of whether a supervising police officer can be civilly liable for the wrongful actions of his subordinate officers. Because we retain flexibility in determining how to address questions that are certified to us,[17] we will reframe the third question as follows: Whether a supervising police officer can be held liable for the wrongful actions of his subordinate officers in connection with an alleged civil rights violation? [18]

■ While Appellee appears to suggest in her brief that supervisory liability exists under a traditional master/servant relationship, this mechanism for imposing liability is nonexistent. As the district court explained in *Mackay v. Lowe*, 529 F.Supp. 504 (E.D.Pa. 1982):

> [I]mposition of vicarious liability on supervisory officials for allegedly unconstitutional acts by their subordinates "is inappropriate because supervisors and their subordinates are fellow servants of the same master-employer … and thus the master-servant relationship, a prerequisite for vicarious liability, is lacking between these individuals."

*Id.* at 505 (quoting *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 148 (E.D.Pa.1977)).

In the recent decision of in *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), a case filed by a Pakistani Muslim in connection with his arrest and detention following the September 11, 2001, attacks,[19] the United States Supreme Court addressed the issue of supervisory liability in the federal analog to a section 1983 case, otherwise known as a *Bivens* case.[20] Addressing the issue of vicarious liability, the high court stated:

> [R]espondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. … Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

—— U.S. at ——, 129 S.Ct. at 1948.

The Supreme Court expressly rejected the contention that " 'knowledge and acquiescence [by supervisors] in their subordinates' use of discriminatory criteria to make classification decisions among detainees' " was sufficient to find that the supervisors had committed a constitutional violation. *Iqbal*, —— U.S. at ——, 129 S.Ct. at 1949. Concluding

---

**17.** *See Buckhannon–Upshur County Airport Auth. v. R & R Coal Contracting. Inc.*, 186 W.Va. 583, 585 n. 2, 413 S.E.2d 404, 406 n. 2 (1991).

**18.** Appellant asked us to reframe the third question to identify the standard for imposing supervisory liability. The recent ruling issued by the United States Supreme Court negating the existence of supervisory liability for civil rights-related actions in *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), dispels the need for us to select such a standard. We note an additional impediment to Appellee's attempt to impose supervisory liability against Chief Pack based on the apparent lack of any allegations expressly averring this type of liability against him in the amended complaint.

**19.** Mr. Iqbal asserted in his complaint that he was designated a person "of high interest" based on his race, religion, or national origin in violation of the First and Fifth Amendments. He alleged that under directives issued by the FBI and the U.S. Attorney General, he was subjected to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penal interest.

**20.** In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the United States Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

that "the term 'supervisory liability' is a misnomer" in a section 1983 suit or a *Bivens* suit, the high court determined:

> Absent vicarious liability, each Governmental official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

*Id.* at ——, 129 S.Ct. at 1949.

Were there any doubt as to the high court's actions with regard to supervisory liability, we find significance in the remarks offered by Justice Souter in his dissent: [21]

> Lest there be any mistake, . . . the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.

*Iqbal,* —— U.S. at ——, 129 S.Ct. at 1957, (Souter, J., dissenting). Criticizing the ma-

jority for addressing an issue that was not briefed or argued, Justice Souter identified several different potential tests for imposing supervisory liability.[22] *See id.* at ——, 129 S.Ct. at 1958; *see also Shaw v. Stroud,* 13 F.3d 791 (4th Cir.1994) (adopting three-factor test for imposing supervisory liability in § 1983 suit).[23]

As it stands today, the issue of supervisory liability in connection with an alleged civil rights violation is clear: there is none. Under the holding of *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009),[24] a supervising police officer may not be held liable for the wrongful actions of his or her subordinate officers in connection with an alleged civil rights violation because a supervising police officer is only liable for his or her own conduct and not that of his/her subordinates. Given our conclusion on this issue, we answer the third certified question in the negative.

Based on the forgoing, we answer the first certified question in the affirmative and the second and third questions in the negative.

Certified questions answered.

---

21. The case was decided by a 5–4 vote.

22. In his dissent, Justice Souter argued that the majority wrongly viewed the issue in a dichotomous fashion: *respondeat superior* liability or no supervisory liability at all. *Iqbal,* —— U.S. at ——, 129 S.Ct. at 1958.

23. Those factors are:
> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Stroud,* 13 F.3d at 799.

24. In addition to addressing supervisory liability in *Iqbal,* the Supreme Court applied the standard it recently adopted for determining whether

pleadings are sufficient to survive a motion to dismiss in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In *Twombly,* the high court analyzed what is required to meet the pleading requirement of Rule 8(a)(2) of the Federal Rules of Civil Procedure that mandates a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, the high court reasoned that the complaint must "state a claim to relief that is plausible on its face." 550 U.S. at 570, 127 S.Ct. 1955. As the Supreme Court explained in *Iqbal,* this plausibility requirement is met when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." —— U.S. at ——, 129 S.Ct. at 1949. Referencing its statement in *Twombly* that neither "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will suffice under this standard, the Court continued its seemingly strict approach to pleading in *Iqbal,* and found that the plaintiff's complaint did not state a claim for purposeful and unlawful discrimination. —— U.S. at ——, 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).